# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

3226701 CANADA, INC., *individually and on behalf of all others similarly situated*,

Plaintiff,

v.

QUALCOMM, INC.; STEVEN M. MOLLENKOPF; DEREK K. ABERLE; GEORGE S. DAVIS; VENKATA S.M. RENDUCHINTALA; CRISTIANO R. AMON; and TIM MCDONOUGH,

Defendants.

Case No.: 15cv2678-MMA (WVG)

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**

[Doc. No. 35]

Defendants Qualcomm, Inc. ("Qualcomm"), Steven M. Mollenkopf, Derek K. Aberle, George S. Davis, Venkata S.M. Renduchintala, Christiano R. Amon, and Tim McDonough (collectively, "Defendants") move to dismiss Lead Plaintiff Public Employees Retirement System of Mississippi's First Amended Complaint (FAC) for failure to state a claim under Federal Rules of Civil Procedure 9(b) and 12(b)(6), as well as under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4. Doc. No. 35. After entertaining the oral arguments of counsel, the Court took the motion under submission for further review and consideration. *See* Doc. No. 53. For the reasons set forth below, the Court affirms its tentative ruling, and **GRANTS** Defendants' motion to dismiss, Doc. No. 35.

## PROCEDURAL HISTORY

On November 30, 2015, Plaintiff 3226701 Canada, Inc. filed this putative securities fraud class action alleging claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., as amended by the PSLRA, 15 U.S.C. § 78u-4, and Rule 10b-5, 17 CFR 240.10b-5, against Qualcomm, Inc. and various directors, officers, and/or employees of Qualcomm, Inc. On February 19, 2016, the Court appointed the Public Employees Retirement System of Mississippi, a member of the putative class, as lead plaintiff,[1] and approved the Public Employees Retirement System of Mississippi's selection of co-lead counsel and liaison counsel. *See* Doc. No. 9. On April 29, 2016, Plaintiff filed the FAC. *See* Doc. No. 26. On June 28, 2016, Defendants filed the instant motion to dismiss the FAC for failure to state a claim under Rules 9(b) and 12(b)(6), as well as the PSLRA.

## BACKGROUND

Because this matter is before the Court on a motion to dismiss, the Court must accept as true the allegations set forth in the FAC, but in doing so, does not make any findings of fact. *See Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 740 (1976). Plaintiff alleges the following.

### *i. Overview*

The gravamen of the FAC is that Defendants made false or misleading statements and/or omissions regarding Qualcomm's Snapdragon 810 ("810"), a microprocessor for use in smartphones and other mobile devices.[2] Plaintiff alleges Defendants' conduct violated Sections 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5. Plaintiff defines the putative Class Period as April 7, 2014 to July 22, 2015, and the putative Class as "all persons and entities that, during the Class Period, purchased or

---

[1] Hereinafter, any reference to "Plaintiff" refers to the lead plaintiff, Public Employees Retirement System of Mississippi.

[2] Plaintiff relies on 41 paragraphs of alleged misstatements. Due to the breadth of Plaintiff's allegations, the Court does not reproduce all of the alleged misstatements in full.

otherwise acquired the publicly traded common stock of Qualcomm and were damaged thereby."[3] *See* FAC ¶¶ 2, 250.

*ii. Parties and Relevant Non-Parties*

Defendant Qualcomm "develops, designs, licenses, and markets worldwide its digital communications products and services, primarily through its two main business segments; Qualcomm CDMA Technologies ("QCT") and Qualcomm Technology Licensing ("QTL")." *See* FAC ¶ 19. One aspect of Qualcomm's QCT business is to sell microprocessors to Original Equipment Manufacturers ("OEMs")—"companies that manufacture the final mobile device product" such as Samsung or LG. *See* FAC ¶ 21, n.5. Qualcomm's stock is traded on the NASDAQ stock market.

Defendant Mollenkopf has been the CEO of Qualcomm since March 2014, and was the President and Chief Operating Officer from November 2011 to March 2014. Defendant Aberle has been the President of Qualcomm since March 2014. Defendant Davis is an Executive Vice President and Chief Financial Officer. Defendant Renduchintala[4] was an Executive Vice President and Co-President of Qualcomm's QCT division at all relevant times. Defendant Amon serves as the Executive Vice President of Qualcomm and is Co-President of QCT. Defendant McDonough served as Vice President of Worldwide Marketing for Qualcomm during the Class Period.

Plaintiff also makes allegations based on information obtained by three confidential witnesses ("CWs"): CW1, CW2, and CW3. CW1 was formerly a Qualcomm software engineer from 2004 through November 2015. CW1 "worked in Qualcomm's Digital Signal Processor ("DSP") program, which worked on the Snapdragon 810. *See* FAC ¶ 28. CW2 was formerly a Qualcomm Senior Staff Engineer in San Diego, who worked for Qualcomm for eight years. He "interacted regularly with OEMs Samsung, LG, and Sony to coordinate the launch" of the 810 in the OEMs'

---

[3] The class definition excludes Defendants and their family members and those entities or persons in which Defendants have controlling interests, or that are related to or affiliated with Defendants.

[4] Defendant Renduchintala is occasionally referred to as Defendant Murthy in the FAC.

products. *See* FAC ¶ 29. CW3 is a former Qualcomm Senior Staff Engineer who worked for Qualcomm for 20 years. During the Class Period, CW3 "was responsible for assessing product test needs for upcoming chipsets, including the Snapdragon 810, including test planning, special test requirements, and IT resource planning." *See* FAC ¶ 30. He also aggregated various test results for the 810 from the Product Test Group, and submitted results to Project Engineer Rajeev Pal, who sent them to Defendant Renduchintala, among others. CW3 reported to the Head of Product Testing, who reported to the Vice President of Engineering, who reported to Qualcomm's "SVP of Engineering in the QCT segment, who in turn reported to James "Jim" Thompson, who in turn reported to Defendant Renduchintala. *See* FAC ¶ 30. CW3 knew "about testing of all QCT chipsets, (specifically including the 810), including allocation of resources (both human and financial) necessary for all stages of testing, and comparative performance of Qualcomm chipsets based on testing results." *See* FAC ¶ 30.

Samsung Electronics Co., Ltd. "is a multinational electronics company headquartered in Suwon, South Korea." *See* FAC ¶ 31. "Samsung designs, manufactures and sells, among other things, consumer electronics (such as smartphones) and electronic components such as silicon semiconductors (including microprocessors like the Snapdragon 810)." *See* FAC ¶ 31. Thus, Samsung is both a customer and competitor of Qualcomm, as Samsung historically purchased Qualcomm's microprocessors, but also designs and manufactures its own microprocessors.

*iii. Factual Allegations*

Since 2007, Qualcomm has developed four series of all-in-one processors,[5] or "Systems on a Chip" ("SoCs")—the Snapdragon 200, 400, 600, and 800 series. A SoC "aggregates multiple, different processors onto a single piece of silicon that works collectively to allow the smartphone to maximize the speed of data processing, improve power efficiency, and create an overall enhanced user experience." *See* FAC ¶ 37. The

---

[5] The FAC also refers to these processors as "chipsets."

advent of SoCs allowed OEMs to develop thinner mobile devices. Unlike competitors who used "off-the-shelf" processors that were not designed for particular devices, Qualcomm designed customized SoCs. *See* FAC ¶ 44.

Different functions of a mobile device are performed by different "functional blocks" of a SoC. *See* FAC ¶ 38. The central processing unit ("CPU") of a mobile device "governs how quickly a device can perform various functions, and determines how well a device can perform multiple different functions simultaneously." *See* FAC ¶ 39. Modern SoCs have multiple cores, which are units that work in concert as a mobile device's CPU regulates its operations, to provide efficient processing. *See* FAC ¶ 39. "Each functional block, and in particular the CPU, processes data by utilizing the electrical energy from billions of transistors to digitize the data signals." *See* FAC ¶ 40. "This electrical energy creates heat within the circuits of the functional blocks and occasionally causes mobile devices to run warm when these blocks are in use." *See* FAC ¶ 40. When the heat becomes excessive, the software controlling the SoC shuts down the entire CPU or one or more of its "cores." *See* FAC ¶ 41. As a result, the SoC slows its processing speed, efficiency, and other capabilities until the device cools off. "In devices with multi-core CPUs, the software controlling the SoC may shut down the most-strained cores," "shift[ing] the work onto the other cores, which typically operate at slower speeds and usually results in slower data processing." *See* FAC ¶ 42. This is known as "throttling." *See* FAC ¶ 42.

In 2013, Qualcomm began developing the Snapdragon 800 series, including the Snapdragon 810, which was to be its "Cadillac" processor. *See* FAC ¶ 46. However "[s]everal broader market forces emerged in 2014 and 2015" that "adversely impacted QCT's ability to (i) compete with processor manufacturers going forward, and (ii) to continue increasing its profit margins." *See* FAC ¶ 47. First, smaller competitors began providing less-expensive SoC processors. Second, smartphones were selling for less, meaning "tighter margins for OEMs and greater scrutiny on costs." *See* FAC ¶ 49. Third, some competitors began to develop SoCs in house, such as Samsung. For those

reasons, Defendants knew the 810 needed to be strong to cement Qualcomm's leadership, differentiate itself from competitors, and justify its processors' costs to OEMs.

Qualcomm planned to customize the 810 to the specific devices that would be using the chipset and launch the 810 in January 2015. Qualcomm also planned to design the 810 "to be fabricated on a 20 nm node utilizing a 32-bit processor." *See* FAC ¶ 66. However, in September 2013, Apple revealed an iPhone with a 64-bit processor—the first ever. Qualcomm was shocked. *See* FAC ¶ 69. "[L]ess than two weeks after the Apple rumor first surfaced, Samsung announced that it would be adopting 64-bit architecture in its upcoming Galaxy S6." *See* FAC ¶ 68. Thus, no later than December 2013, Defendant Renduchintala decided Qualcomm must make the 810 a 64-bit chipset, and in January 2014, the "industry media" reported this decision. *See* FAC ¶ 70.

According to CW2, at some point in 2013, Samsung demanded Qualcomm have the 810 commercially ready in November 2014, earlier than Qualcomm had planned. CW2 reports that Samsung threatened to use its own SoC if Qualcomm could not make that deadline. Samsung was Qualcomm's second largest customer.

To meet Samsung's deadline and transform the 810 into a 64-bit processor, Qualcomm "knowingly deviated from its historical practice of" using customized CPU cores and used off-the-shelf CPU cores, which "would prove to be a key contributor to [] overheating problems." *See* FAC ¶ 71. Four of the 810's cores, called Cortex-A57 cores, were "prone to overheating, especially when manufactured with 20nm transistors." *See* FAC ¶ 73.

According to Professor Scott Thompson, an expert in electronic engineering and semiconductor manufacturing, after design, a company fabricates sample SoCs from silicon, called "first silicon" or "Silicon on Dock." *See* FAC ¶ 54. According to Thompson, the first silicon is the "most important, closely monitored, and heavily scrutinized milestone for an SoC." *See* FAC ¶ 55. Thompson states that after receiving these samples, companies typically test them, and the results are generally heavily scrutinized and communicated to key executives.

In February or March 2014, Qualcomm received the first silicon, and according to CW3, began testing the chipset. *See* FAC ¶ 75. To determine the stability of a chipset, Qualcomm's Product Test Group would determine Crashes Per Thousand Hours ("CPTH") and Mean Time Between Failures ("MTBF"). The goal is for a chipset to have a higher MTBF, and a lower CPTH. In March 2014, one of Qualcomm's test groups began testing the 810. CW3 received reports of the test results and sent weekly emails containing those results to "a wide distribution list within the Company, including to his supervisor's boss, VP Rashmi Chari." *See* FAC ¶ 78. CW3 believes Pal had access to the content of those emails, and that the data was used in presentations to "executive teams." *See* FAC ¶ 78. CW3 reports that the March 2014 tests revealed overheating problems, and "that every aspect of the 810 was failing." *See* FAC ¶ 79. Although not abnormal at first silicon, CW3 states that Qualcomm could not resolve those issues "for more than nine months, according to the documents reviewed by CW 3 during the December 2014 CSRR[6] processes." *See* FAC ¶ 79. CW3 had never "seen any other chip set get this much attention." *See* FAC ¶ 79.

On April 7, 2014, Qualcomm publicly advertised the 810, touting it as its "highest performing platform to date" and stating that it had "industry-leading power efficiency." *See* FAC ¶ 80.

In May 2014, CW2 began working on the 810 project as a Senior Staff Engineer "on a team responsible for one of the 810's software sub-systems." *See* FAC ¶ 83. CW2 received daily emails, many discussing overheating problems with the 810. During May 2014 and through November 2015, CW2 participated in "Target Scrum" meetings which focused on the 810's issues, such as thermal issues. *See* FAC ¶ 84.

---

[6] Prior to shipping the chipsets to OEMs ("Customer Ship date" or "CS"), and after testing is completed, Qualcomm would hold customer ship readiness review meetings ("CSRR meetings") to determine whether to approve commercial production of chipsets, and frequently would discuss the chipset's scores on CPTH and MTBF. *See* FAC ¶ 62 (according to CW3).

In June 2014, CW2 became aware that the 810 "was experiencing more severe than normal thermal issues." *See* FAC ¶ 86. Defendant Renduchintala "personally called for more engineers and financial resources during the summer of 2014 to address the 810's thermal issues." *See* FAC ¶ 86. By July 2014, CW3 said people at Qualcomm were "in a panic" due to "the large number of issues with the 810." *See* FAC ¶ 87. Qualcomm was "throwing everything at it" but was unable to solve the problems. *See* FAC ¶ 87. According to CW3, Qualcomm was testing 10 times more software versions for the 810 than any other chipset prior, and testing them 10 times as often—testing at least five or six software versions per day, and on weekends. *See* FAC ¶ 88. CW3 states that by July 2014, Pal was sending "this information" to Defendant Renduchintala. *See* FAC ¶ 89.

In August 2014, Qualcomm sent Samsung and other OEMs samples of the 810. *See* FAC ¶ 61. "CW 3 stated that Qualcomm had the option make [sic] modifications to the chipset based on the OEMs' test results." *See* FAC ¶ 61. CW2 states that OEMs reported overheating. According to CW2, Qualcomm attempted to determine whether the overheating was caused by the 810 or the OEMs' devices. "[I]n almost every instance, Qualcomm confirmed that the thermal issues were not caused by the OEMs' mobile device designs." *See* FAC ¶ 91. Further, the OEMs did tests and determined that their mobile devices were not causing the thermal issues. *See* FAC ¶ 92. Also during August 2014, according to CW2, "there were rumors circulating among the OEMs" that the 810 had thermal issues, and that Samsung was aware of the issues and would use its own chip. *See* FAC ¶¶ 90, 96.

In September and October 2014, CW1 states that there were many "internal discussions at Qualcomm" "during lunch meetings with other engineers" about the 810's overheating issues. *See* FAC ¶ 93. According to CW2, Defendant Renduchintala raised questions regarding the issues between September and November 2014. In a "meeting in September 2014," Pal called the 810 a "piece of crap." *See* FAC ¶ 94. On another call,

CW2 remembers Defendant Renduchintala asking what the root cause of the overheating was.

In October 2014, CW2 "met with his counterpart at Samsung . . . to discuss the rollout of the Snapdragon 810," and his counterpart confirmed that Samsung decided not to use the 810 "because of the thermal issues." *See* FAC ¶ 96. Within a couple of weeks of that meeting, CW2 went to a meeting during which Defendant Renduchintala confirmed that Samsung would not use the 810, and told the team to stop working on the Samsung launch. *See* FAC ¶ 97. At that same time, CW1 reports that Qualcomm engineers had discussions during lunch meetings "indicating that Samsung was dropping [the 810] because of the overheating issues." *See* FAC ¶¶ 96–97.

During November and December 2014, CW3 reports that Defendant Renduchintala received daily written reports, and the "bulk" discussed thermal issues, which were still unresolved. On November 19, 2014, on Qualcomm's "Analyst Day," Defendant Amon stated that "Snapdragon processors continue to set the design point for the premium tier has [sic] been a number of flagship devices across many of the OEMs. I won't list them all, but I think it's very clear that we'll be able to maintain our leadership position in the premium tier." *See* FAC ¶ 98.

According to CW3, in December 2014, Defendant Renduchintala attended daily "Scrum" meetings in which the thermal issues were discussed. *See* FAC ¶ 95. Also on December 4, 2014, *Business Korea* published an article, "Unexpected Hurdle: Problems in Qualcomm Snapdragon Set Alarm Bells Ringing for Samsung, LG." *See* FAC ¶ 130. The article "reported that according to an internal source '[t]he Snapdragon overheats when it reaches a specific voltage' and for that reason, among others, it was 'unclear if the Snapdragon 810 will be used in premium smartphones like the Galaxy S6, the G4, and the Xperia Z4.'" *See* FAC ¶ 130. A few days later in December 2014, TechRadar reported that a Qualcomm spokesperson had stated that they would not comment on "any of the rumor or speculation you referenced," but that "everything . . . remains on track and we expect commercial devices to be available in 1H 2015." *See* FAC ¶ 131.

Gadgets 360 and Tom's Hardware published similar articles soon after. *See* FAC ¶¶ 132–33.

In November and December 2014, Qualcomm held several customer ship readiness review meetings ("CSRR meetings") regarding the 810. *See* FAC ¶ 101. According to CW3, the purpose of those meetings is to determine whether to approve commercial production of chipsets, and frequently the parties discuss the chipset's scores on CPTH and MTBF. *See* FAC ¶ 62. At the CSRR meetings regarding the 810, the participants discussed tests that "showed abnormally high Crashes Per Thousand Hours and abnormally low Mean Time Between Failures." *See* FAC ¶ 101.

On January 5, 2015, LG launched the G Flex 2 smartphone which used the 810. According to CW2, Qualcomm pressured LG to launch the phone that month "despite knowledge of abnormal thermal issues" that were still unresolved "even up to a few days prior to the product's commercial launch." *See* FAC ¶ 102. "These thermal issues in the G Flex 2 caused LG's 2Q15 earnings to drop by 60%." *See* FAC ¶ 103.

On January 20, 2015, Bloomberg published an article, which "reported on rumors, sourced from people with knowledge of the matter," and stated that Samsung would use its own chips in the next Galaxy S phones, "dropping its use of a Qualcomm, Inc. chip that overheated during the Korean company's testing." *See* FAC ¶¶ 104, 176. In response, Qualcomm's common stock dropped 1.23% on heavy trading volume. Analysts attributed the decline to Bloomberg's article, but many analysts still believed Samsung would not drop the 810 entirely. *See* FAC ¶ 178.

On January 28, 2015, Qualcomm issued a press release announcing that they lowered their outlook for the second half of fiscal year 2015 for their QCT business, "largely driven by the effects of" their expectation that the 810 would "not be in the upcoming design cycle of a large customer's flagship device," among other things. *See* FAC ¶ 105, 180. Analysts interpreted this statement to mean Qualcomm expected Samsung not to use the 810 in their Galaxy S6. *See* FAC ¶ 180. Qualcomm's common

stock decreased by 10.58% on heavy trading volume in response. Analysts attributed the drop to the revelation that Samsung would not use the 810 in its Galaxy S6.

After the press release, a Citigroup analyst asked Defendant Mollenkopf about the "news in the press about overheating," and asked if there was a compatibility issue between the "flagship device" and the 810. On January 28, 2015, Defendant Mollenkopf stated that the 810 was working "the way that we expected" it to, and that the 810 would be included in over 60 premium devices, and that the concern is "really related to one OEM." *See* FAC ¶ 141. Further, Defendant Amon stated on January 31, 2015, "[c]ategorically, we don't see any problem with the chip." *See* FAC ¶ 106.

On March 2, 2015, an OEM, HTC, launched its M9 device with the 810, "which was widely reported to have overheating problems that caused subsequent performance problems." *See* FAC ¶ 109. Further, "there were reports of problems with Xiaomi's flagship, the Mi Note Pro," which used the 810. *See* FAC ¶ 110. The Wall Street Journal reported that "reports of the 810's overheating problems 'dampened sales of Xiaomi's . . . Mi Note.'" *See* FAC ¶ 110. Sony's Xperia Z3+ and Z4 also "performed poorly due to the 810." FAC ¶ 111. An article by Android Authority called the 810 "the bane of many flagship phones in 2015." *See* FAC ¶ 111. In April 2015, media outlets released benchmark test results indicating devices using the 810 "throttl[ed]" after short periods of use. *See* FAC ¶ 114.

On April 28, 2015, LG announced its decision to use the Snapdragon 808, a less powerful chip than the 810, in its G4 device. CW2 states that LG had originally planned to use the 810 in both the G Flex 2 and G4, but because the G Flex 2 had overheating issues due to the 810, LG decided to use the 808. Qualcomm reacted by stating that LG made that decision "over a year ago." *See* FAC ¶ 113.

On May 6, 2015, Defendant McDonough stated to Forbes that "[t]he rumours are rubbish, there was not an overheating problem with the Snapdragon 810 in commercial devices." *See* FAC ¶ 115. On May 27, 2015, Defendant Renduchintala stated, "I think the device in the market has performed to our expectations and to the expectations of that

of our customers." *See* FAC ¶ 172. He went on to say, "[w]e have won over 60 flagship designs" but, "[o]f course, there is one major one we didn't win and I think that is more to do with the alternatives that were available at that point in time that used technology choices that quite frankly when we made the decision on the 810 we didn't feel were available to us in an economically viable opportunity." *See* FAC ¶ 172. He concluded that "we have been very pleased with the flagship designs that have been launched on that product, the LG 2Flex, the HTC M19, the Xiaomi Note Pro." *See* FAC ¶ 172. On June 30, 2015, Defendant McDonough stated the 810 was "performing as expected" and "we have not observed any abnormal thermal issues." *See* FAC ¶ 174.

On July 22, 2015, Qualcomm issued a press release lowering its guidance for its QCT business for the fourth quarter of the fiscal year, "driven primarily by factors impacting premium-tier demand, including: increased concentration within the premium tier causing reduced demand for certain OEM devices that include our chipset; lower demand for our premium-tier chipsets from a vertical customer [*i.e.*, Samsung]; and lower sell through in China of certain handset models using our premium-tier chipsets." *See* FAC ¶ 184. As a result, Qualcomm's common stock declined 3.75% on heavy trading volume. *See* FAC ¶ 185.

## LEGAL STANDARD

A Rule 12(b)(6) motion tests the legal sufficiency of the claims made in the complaint. Accordingly, dismissal under Rule 12(b)(6) is proper where the complaint fails to set forth a "cognizable legal theory," or where there is "an absence of sufficient facts alleged to support a cognizable legal theory." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Although a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief" under Rule 8(a)(2), "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations, brackets, and

citations omitted). In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all "allegations of material fact," and construe them "in the light most favorable to the nonmoving party." *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996).

"[A] complaint stating claims under section 10(b) and Rule 10b–5 must satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA." *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), *as amended* (Feb. 10, 2009). Under Rule 9(b), when the complaint includes allegations of fraud, a party must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "In other words, the complaint must set forth what is false or misleading about a statement, and why it is false." *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009) (internal quotation marks omitted). Additionally, the PSLRA requires that plaintiffs plead scienter with particularity. *Zucco Partners*, 552 F.3d at 990.

## DISCUSSION

### I. Defendants' Requests for Consideration of Documents Incorporated by Reference and Requests for Judicial Notice

As an initial matter, Defendants request the Court consider 41 documents in addition to the FAC. *See* Doc. No. 35. Defendants allege the FAC incorporates by reference the majority of the documents, and requests the court take judicial notice of all others. In the alternative, Defendants request the Court judicially notice all 41 documents. In determining the propriety of a Rule 12(b)(6) dismissal, courts generally may not look beyond the complaint for additional facts. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *Id.*; *see also Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). Here, the Court need not consider extraneous documents in order to

conclude that Plaintiff has not met the heightened pleading standards governing its claims. Accordingly, the Court **DENIES** Defendants' request as moot, and without prejudice.

**II. Motion to Dismiss**

Plaintiff alleges causes of action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5. Section 10(b) "makes it unlawful for 'any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." *See Zucco*, 552 F.3d at 989 (quoting 15 U.S.C. § 78j(b)). Rule 10b-5, promulgated under the Securities Exchange Act, makes it unlawful "for any person . . . [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." *Id.* at 989–90 (quoting 17 CFR 240.10b-5(c)). Under section 20(a) of the Securities Exchange Act, "certain 'controlling' individuals" may also be liable for violating section 10(b) so long as a plaintiff sufficiently demonstrates a primary violation of section 10(b). *Id.* at 990. Controlling persons are those who "exercised actual power or control over the primary violator." *See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003). To plead a primary violation of Rule 10b-5, the plaintiff must plead: "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *In re Daou Sys. Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)).

Defendants move to dismiss both the Section 10(b) cause of action and the 20(a) cause of action against the individual defendants. However, Defendants only discuss the 10(b) cause of action because Defendants argue Plaintiff does not sufficiently plead a

primary violation under 10(b) and thus, Plaintiff does not sufficiently plead the derivative 20(a) claim. Regarding Plaintiff's claim of a primary violation, Defendants do not dispute that Plaintiff has sufficiently pleaded a connection with the purchase or sale of a security or economic loss. Rather, Defendants argue that Plaintiff fails to sufficiently plead any materially false or misleading statements or omissions, and fails to adequately plead scienter and loss causation.

### *A. Whether Plaintiff Adequately Pleads Material Misrepresentations Or Omissions*

To state a claim for securities fraud, a plaintiff must allege a material misrepresentation or omission. A misrepresentation or omitted fact is material if there is a substantial likelihood that the misstatement or omitted fact "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *See Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988); *see In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1021 (S.D. Cal. 2005).

To plead falsity with the requisite particularity, "a securities fraud complaint must . . . specify each statement alleged to have been [false or] misleading, the reason or reasons why the statement is [false or] misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . all facts on which that belief is formed." *Zucco*, 552 F.3d at 990–91 (internal quotation marks omitted). "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet this standard." *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).

Further, "Rule 10b–5 and Section 14(e) in terms prohibit *only* misleading and untrue statements, not statements that are incomplete." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). In other words, "[section] 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44–45 (2011). "Disclosure is required under these provisions only when necessary 'to make . . . statements made, in

the light of the circumstances under which they were made, not misleading.'" *Id.* (quoting 17 C.F.R. § 240.10b-5). An omission is misleading where it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody*, 280 F.3d at 1006 (citing *McCormick v. The Fund American Cos.*, 26 F.3d 869, 880 (9th Cir. 1994)). "Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market." *Matrixx*, 563 U.S. at 45.

Here, to determine whether Plaintiff has sufficiently alleged actionable statements, the Court must consider the timing and circumstances under which each statement was made. *See Bruce v. Suntech Power Holdings Co. Ltd.*, 64 F. Supp. 3d 1365, 1375 (N.D. Cal. 2014) (stating that a complaint must allege the subject "statements were false *when made*"). For that reason, the Court addresses the statements at issue chronologically.

In April and August of 2014, Qualcomm allegedly made certain statements regarding the 810 in a press release and an online article. *See* FAC ¶¶ 117–121. The statements describe the 810 as Qualcomm's "highest performing" chipset, "enabl[ing] an exceptional overall user experience with seamless connectivity and industry-leading power efficiency," and "enabl[ing] great mobile experiences." *See* FAC ¶¶ 117, 119. Also, Qualcomm's online article stated that the 810 would "change the next generation of user experience[,] [f]or the best." *See* FAC ¶ 119. Plaintiff alleges these statements misrepresented the 810's then-current performance and abilities because "initial testing of the Snapdragon 810 demonstrated that every aspect of the chip was failing as a result of the existence of myriad issues, including overheating," which "materially affected the performance, speed, efficiency, and battery life of the Snapdragon 810." *See* FAC ¶¶ 118, 120. Further, the FAC alleges the statements misstated Qualcomm's ability to maintain its one to two year technological lead over its competitors and "its dominant market position with flagship mobile devices." *See* FAC ¶¶ 118, 121.

While the FAC alleges in detail that the initial samples of the 810 were overheating during Qualcomm's testing between April and August 2014, Qualcomm's statements in

April and August amount to no more than non-actionable puffery. *See* FAC ¶¶ 75–89. "Statements of mere corporate puffery, vague statements of optimism like good, well-regarded, or other feel good monikers, are not actionable because professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) (internal quotation marks omitted). For example, the Ninth Circuit has held that a company's statement that their new laptop computer was "going to be the best Power Mac ever" was non-actionable puffery. *See In re Apple Computer, Inc.*, 127 F. App'x at 305. Qualcomm's statements touting its product as "industry-leading" and enabling an "exceptional" user experience, for example, are too vague to constitute factual misstatements, particularly where the product was still in its development stage. Further, the Court is unpersuaded that something as difficult to quantify as Qualcomm's ability to maintain a one to two year technological lead may serve as the factual basis for finding any of Defendants' statements to be false or misleading.[7] This is especially so when the statements do not refer to Defendants "technological lead" or position amongst competitors.

Additionally, Plaintiff alleges Defendants made several misleading statements in November and December 2014. *See* FAC ¶ 122–129. For example, on November 5, 2014, Qualcomm filed a Form 10-K with the Securities Exchange Commission, which was signed by Defendants Mollenkopf and Davis, and stated that Qualcomm's "CPU cores are designed to deliver high levels of compute performance at low power, allowing manufacturers to design slim and powerful devices with longer battery life." *See* FAC ¶ 123. It also stated that the 810 processors are "designed to ensure that the CPU, DSP and GPU work efficiently together, each being powered up and utilized only when needed, which enhances the processing capacity, speed and efficiency of our Snapdragon

---

[7] Throughout the FAC, Plaintiff provides this as a basis for why multiple of Defendants' statements are false or misleading. The Court finds this basis unpersuasive as to all of Defendants' allegedly misleading statements.

processors and the battery life of devices using our processors." *See* FAC ¶ 123. On November 19, 2014, Defendant Amon spoke at Qualcomm's Analyst Meeting, stating that "Snapdragon processors continue to set the design point for the premium tier has been [sic] a number of flagship devices across many of the OEMs." *See* FAC ¶ 124. He stated, "I won't list them all, but I think it's very clear that we'll be able to maintain our leadership position in the premium tier." *See* FAC ¶ 124. At the Analyst Meeting, Defendant Renduchintala also purportedly stated, in part, that the 810 "epitomizes our premium tier leadership, we believe," as well as "delivers best-in-class LTE," "a complete UltraHD experience," "leading camera capability," and "immersive and mind-blowing gaming experiences." *See* FAC ¶ 125. On December 2, 2014, Qualcomm allegedly issued an article stating that "[m]any of the flagship smartphones released next year are expected to be built around Qualcomm Snapdragon 810 processors," and describing the 810 in similar terms as Defendants Amon and Renduchintala did at the Analyst Meeting, such as providing "the most advanced mobile user experiences." *See* FAC ¶ 127.

Plaintiff alleges the November 2014 and December 2, 2014 statements were false or misleading because the 810 "suffered from overheating issues which materially affected the performance, speed, efficiency, and battery life of the Snapdragon 810, and in turn, any devices incorporating and relying on the 810 chipset." *See* FAC ¶ 128. Also, Plaintiff alleges Defendants' statements to the effect that the 810 would allow Qualcomm to maintain its leadership position, and that many flagship smartphones would include the 810, were false or misleading because Samsung had decided not to use the 810 in its flagship phone due to overheating issues. The FAC alleges Samsung's decision not to use the 810 constituted a "huge blow to the Company's 'leadership position in the premium tier.'" FAC ¶ 129.

Again, the majority of these statements are statements of belief or unspecific statements of puffery—for example, "set the design point" and "best-in-class LTE." *See In re Siebel Sys., Inc. Sec. Litig.*, 2005 WL 3555718, at *3 (N.D. Cal. 2005) (listing

statements "touting new products as 'technological advancements'" and asserting a company as a market leader or as "set[ing] the standard" as too vague to be actionable). While even statements of opinion or corporate optimism might be actionable "in certain circumstances" where the statements "are anchored in 'misrepresentations of existing facts,'" Plaintiff fails to allege contextual facts which would render the above statements false or misleading. *See Mulligan v. Impax Laboratories, Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014). Specifically, Plaintiff does not allege Defendants' statements were false or misleading for the reasons that Plaintiff claims they were. For example, Plaintiff's allegation that the 810 was still showing signs of overheating and abnormal rates of crashing in November and December 2014 does not render false or misleading Defendants' vague statements regarding the 810's features and design, or assertions regarding its future inclusion in commercial devices—particularly when the statements were made while the product was still being tested and developed. *See* FAC ¶ 101–02; *see Mulligan*, 36 F. Supp. 3d at 966 (stating that courts must examine the "entire statement and its circumstances to determine if it is actionable").

Moreover, Plaintiff fails to sufficiently plead Defendant Amon's assertion that the 810 would be included in many flagship devices was false or misleading based on the alleged fact that, by November 2014, Samsung had decided not to use the 810 in its flagship device. The PSLRA prohibits false or misleading statements, not incomplete statements. *Brody*, 280 F.3d at 1006. The FAC does not allege facts that would render Defendant's arguably incomplete statement misleading or false. For example, Plaintiff does not contend that many OEMs were not planning on using the 810, and in fact, Plaintiff alleges that many OEMs did include the 810 in their flagship devices. Also, Plaintiff does not allege Qualcomm had at any point prior stated that Samsung planned to use the 810 in its Galaxy S6, or even that the public believed Samsung would at that time. Lastly, Plaintiff's allegation that Samsung's decision was a "huge blow" to Qualcomm's "leadership position" is too subjective and conclusory to constitute a factual reason why Defendants' statements were false or misleading. Accordingly, Plaintiff fails to

sufficiently plead Defendants' statements in November 2014 and on December 2, 2014 were false or misleading.

After December 4, 2014, Plaintiff alleges the circumstances surrounding some of Qualcomm's statements changed. According to the FAC, on December 4, 2014, Business Korea published an article, "Unexpected Hurdle: Problems in Qualcomm Snapdragon Set Alarm Bells Ringing for Samsung, LG." *See* FAC ¶ 130. The article "reported that according to an internal source '[t]he Snapdragon overheats when it reaches a specific voltage' and for that reason, among others, it was 'unclear if the Snapdragon 810 will be used in premium smartphones like the Galaxy S6, the G4, and the Xperia Z4.'" *See* FAC ¶ 130. Also, the article opined that "Samsung is likely to solve the problem" by using its own chips in the Galaxy S6. *See* FAC ¶ 99. Plaintiff alleges that, a few days later in December 2014, TechRadar published an article titled "Galaxy S6 and LG facing delays thanks to Snapdragon 810 defects?" Then, TechRadar allegedly updated their article with a quote from a Qualcomm spokesperson, which Plaintiff alleges constitutes an actionable statement under the federal securities laws. *See* FAC ¶ 131. The spokesperson reportedly stated: "We won't comment on any of the rumor or speculation you referenced but I can tell you that everything with Snapdragon 810 remains on track and we expect commercial devices to be available in 1H 2015." *See* FAC ¶ 131. Additionally, the FAC alleges that on December 8, 2016, Gadgets 360 reported that Jon Carvill, Senior Director of Public Relations at Qualcomm "cleared the air" after Business Korea's report, stating everything was on track and commercial devices are expected in the first half of 2015. *See* FAC ¶ 132. According to the FAC, Tom's Hardware posted a similar article that same day stating, "Qualcomm has denied that any of these rumors are true." *See* FAC ¶ 133.

To allege a false or misleading statement or omission, Plaintiff must allege "a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression." *See In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010) (citing

*In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991)). Here, unlike Defendants' statements prior to December 4, 2014, Plaintiff alleges Defendants made the above statements in response to Business Korea's publication and in close proximity in time to the article and subsequent articles describing the content of the Business Korea article.[8] In light of the responsive nature of Defendants' statements and the fact that Defendants' dismissed the content of the articles as "rumor or speculation," the statements could be read as reassurances regarding the articles' content—*i.e.*, that the 810 was overheating, which may cause delays or cause OEMs such as Samsung to forego using the 810 in their devices, such as Samsung's Galaxy S6.

Accordingly, the Court looks to the facts alleged to be in existence in December 2014. With respect to overheating issues, Plaintiff fails to plead with sufficient particularity that the 810's alleged overheating issues were significant enough in December 2014 that Defendants were required to disclose them to the public in order to avoid "affirmatively creat[ing] an 'impression of a state of affairs that differed in a material way from the one that actually existed.'" *See Reese v. Malone*, 747 F.3d 557, 570 (9th Cir. 2014) (internal alterations omitted) (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008)). Plaintiff merely alleges that the 810 suffered from "abnormal" thermal issues that were still unresolved "during the November/December 2014 timeframe," and that they decided to "go ahead with commercial production by December 2014, knowing that the chip had severe overheating problems." *See* FAC ¶¶ 95, 101. Plaintiff alludes to written reports regarding such thermal issues, but fails to quote from them, include any, or provide any other specifics regarding their contents except to say that they reveal overheating. Also, Plaintiff does not sufficiently link its allegation that the 810 was showing abnormal rates of crashing in November and December 2014 to allegations of overheating issues. *See* FAC ¶ 101–02.

---

[8] For this reason, contrary to Defendant's assertion, *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365 (S.D.N.Y. 2007) is distinguishable.

Concerning potential delays caused by overheating issues, Plaintiff does not allege that there were any delays with the 810. Accordingly, Plaintiff fails to allege Defendants' reassurances regarding potential delays were false or misleading.[9]

Regarding whether the 810 would be used in several flagship devices, Plaintiff only alleges Defendants' statements were false or misleading as to Samsung's use of the 810 in its Galaxy S6. Plaintiff alleges Defendants' statements were misleading because by December 2014, Samsung had already made the decision to forego using the 810 in its Galaxy S6 device "because of the overheating issues." *See* FAC ¶¶ 96–97. However, Plaintiff does not allege with particularity that Samsung's reason for foregoing using the 810 was based on the chip overheating. Plaintiff alleges that CW2 attended a meeting with Defendant Renduchintala in November 2014, during which Defendant Renduchintala stated that Samsung would not use the 810, but the FAC does not allege that Defendant stated why. Plaintiff's sole allegations regarding Samsung's reason for its decision not to use the 810 are undetailed and based entirely on a confidential witness and other unidentified sources. *See Applestein v. Medivation, Inc.*, 561 F. App'x 598, 600 (9th Cir. 2014) (stating "uncredited and speculative conclusions [by confidential witnesses and experts without personal knowledge] do not provide an adequate basis" for pleading falsity). For example, Plaintiff alleges that CW2 reports that he met with his unnamed "counterpart at Samsung" who told him that "Samsung planned to abandon the 810 because of thermal issues," and that unnamed Qualcomm engineers had discussions during lunch meetings "indicating that Samsung was dropping [the 810] because of the overheating issues." *See* FAC ¶¶ 96–97. Plaintiff's only other allegation on the subject comes from a Bloomberg article reporting on information gleaned from unnamed sources. *See* FAC ¶¶ 104, 176.

---

[9] The Court's conclusion also applies to Plaintiff's allegations that Tim Leland falsely stated that "there aren't any significant technical issues that will cause a delay." *See* FAC ¶ 135.

In January 2015, Defendants purportedly made additional false or misleading statements regarding the 810. Defendant Aberle allegedly stated, in response to a question regarding power consumption issues with the 810, "[w]e try not to comment too much on rumors" and "we're on track with the 810 and LG is planning to launch the G Flex 2 in the near future with the 810." *See* FAC ¶ 134. However, Plaintiff does not allege there were power consumption issues with the 810, let alone in or around January 2015. It does not suffice to allege that in November and December 2014, the 810 "showed abnormally high Crashes Per Thousand Hours and abnormally low Mean Time Between failures," and had "abnormal" or "severe overheating problems that rendered impotent the performance the Company promised." FAC ¶ 101–02. Those allegations are not particularized, nor do they speak to power consumption.

Further, Plaintiff alleges Defendants made several statements in January 2015 such as that Qualcomm was "on track with the 810" and that it has had "good traction" with OEMs. *See* FAC ¶ 134. However, as discussed above, statements such as "we're on track" or that the 810 has "good traction" are too vague to be misleading without some other context, such as that the statements being made in response to some specific rumor, as above, or allegations as to their falsity. In other words, Plaintiff does not allege facts indicating that the statements were false, nor does Plaintiff allege context that would have required Defendants to disclose additional information so as "to make [their] statements, in light of the circumstances in which they were made, not misleading." *See Matrixx Initiatives, Inc.*, 563 U.S. at 44–45 (quoting 17 C.F.R. § 240.10b-5).

Subsequently, according to the FAC, Bloomberg issued an article on January 20, 2015 stating that Samsung would use its own chip because the 810 had overheated during the Korean company's testing. *See* FAC ¶¶ 104, 176. On January 28, 2015, Plaintiff alleges Qualcomm publically lowered its outlook for its QCT division "largely" because Qualcomm expected that the 810 would not be "in the upcoming design cycle of a large customer's flagship device." FAC ¶ 7.

The FAC contends that, also on January 28, 2015, Defendants Mollenkopf and Aberle made several misstatements during a conference call. *See* FAC ¶¶ 139–42. During the call, Defendant Mollenkopf purportedly stated that "design momentum [. . .] remains robust" and that the "Snapdragon 810 is performing well." FAC ¶ 139. Plaintiff alleges Mollenkopf also stated that "[a]ny concerns about the 810 in terms of design traction really are probably limited to one OEM versus anything else." FAC ¶ 140. In response to an analyst's question regarding overheating, and whether overheating issues were isolated to one particular device, Defendant Mollenkopf allegedly responded that "this device is working the way that we expected" and that they were "quite pleased with how that is performing." *See* FAC ¶ 141. Any concerns, he stated, are "really related to one OEM." *See* FAC ¶ 141. The FAC also alleges that, Defendant Aberle responded to a similar question by stating, "I would think if [sic] it as isolated really to one account and one portion of their portfolio." *See* FAC ¶ 142.

Plaintiff alleges the above statements were materially false or misleading because Samsung had decided not to use the 810 based on its propensity to overheat, and because "other OEMs were concerned about using the 810 chipset in their devices," and LG "backtracked" regarding its plan to use the 810 in its G4 devices because the 810 had allegedly overheated in its G Flex 2. *See* FAC ¶ 146. However, Plaintiff does not allege with sufficient particularity that other OEMs were concerned about overheating at that point in time. Also, the FAC does not describe when LG observed overheating issues or made its decision not to use the 810 in its G4 devices. The FAC merely states that LG *announced* its decision regarding the G4 on April 28, 2015, which was months after the conference call. Also, the FAC does not include any other facts regarding LG's testing, or details of alleged overheating in LG's commercial devices. Likewise, regarding other

OEMs, the FAC does not provide sufficient contemporaneous facts to support Plaintiff's claim that Defendants made actionable misstatements during the conference call.[10]

Moreover, in the FAC, Plaintiff describes articles issued in late January 2015 quoting Defendant Amon, a Qualcomm press release from February 2, 2015, several statements made on February 12, 2015 in an online report, and several statements by Defendants McDonough and Aberle, also made on February 12, 2015. *See* FAC ¶¶ 147–152. However, with respect to these statements, Plaintiff does not delineate "the reason or reasons why the statement[s] [are] misleading" or, if the allegations are made on information and belief, "all facts on which that belief is formed." *See* 15 U.S.C. § 78u–4(b)(1). Accordingly, Plaintiff's allegations regarding those statements do not satisfy the applicable pleading standards.

Additionally, Plaintiff alleges Defendants Amon and Renduchintala made actionable misstatements on March 2, 2015 at the GSM Association Mobile World Congress when they stated that attendants at the show would see a number of OEMs used the 810 in their flagship phones that year, that their technology was being used "pervasively," and that the 810 will be included in "60 different designs." *See* FAC ¶ 161. "Shortly thereafter," Defendant Renduchintala allegedly touted Qualcomm's "general trajectory" regarding its Snapdragon processors. *See* FAC ¶ 162. The FAC contends Defendants' statements were false or misleading because of the 810's alleged overheating issues and resulting effects on "performance, speed, efficiency, and battery life of the [810]." *See* FAC ¶ 166. However, even if Plaintiff provided particularized facts indicating that the 810 had such problems at that point in time, those facts would not render false or misleading Defendants' statements regarding the 810's inclusion in multiple OEMs' devices or generalized and optimistic statements about Qualcomm's portfolio after the loss of Samsung. Contrary to how the FAC frames the false and

---

[10] For example, the FAC alleges CW2 stated that "there were rumors circulating among the OEMS" regarding overheating issues in August 2014—approximately 5 months prior to the conference, during the chip's development. *See* FAC ¶ 96.

misleading nature of Defendants' statements, Defendants' statements were not made in response to questions regarding overheating, and did not address the issue of overheating. *See* FAC ¶¶ 161–62.

Subsequently, Plaintiff contends, Defendants made multiple misleading statements throughout April, May, and June 2015. For many of the same reasons as discussed above, Plaintiff fails to plead any actionable misstatements. For example, Plaintiff alleges Defendant McDonough, when asked about LG's decision not to use the 810 in its G4 device, stated, "[t]he decisions on which chipsets to put on which handsets come from over a year ago." *See* FAC ¶ 169. Where the FAC is silent as to when LG made the decision regarding the G4, and only concludes without other factual support that LG's decision was based on overheating, Plaintiff fails to plead an actionable misstatement. Also, Plaintiff alleges Defendant McDonough stated that the rumors regarding the 810 "are rubbish, there was not an overheating problem with the Snapdragon 810 in commercial devices." *See* FAC ¶ 170. However, Plaintiff's allegations regarding the 810 overheating in *commercial* devices—as opposed to during the technology's development stage—are sparse and based on third party reports of overheating in some devices, which the FAC describes in a conclusory, undetailed fashion. *See* ¶¶ 109–11, 113–14. Accordingly, Plaintiff "fail[s] to sufficiently support [its] allegations of false and misleading statements with great detail and all relevant circumstances."[11] *See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 930 (9th Cir. 2003).

In more general terms, the breadth of the alleged misstatements included in the FAC make it difficult to discern which particular statements Plaintiff intends to base its claims on. *See Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (stating that a complaint must give fair notice of the grounds of its claims in order to allow a defendant

---

[11] The Court declines to address Defendant's arguments regarding the PSLRA's safe harbor provision because Plaintiff fails to satisfy the applicable pleading standards as discussed above, without regard to the safe harbor provision.

to defend itself). For example, the FAC places emphasis—such as using bold or italic fonts—on portions of paragraphs of statements without explanation regarding the emphasis. Along similar lines, by lumping several paragraphs of statements together and stating in conclusory terms why all of the statements are false or misleading, the FAC fails to describe specific, contemporaneous facts illustrating their false or misleading nature at that time, as required to satisfy the applicable heightened pleading standards.

*B. Whether Plaintiff Adequately Pleads Scienter*

To plead scienter in accordance with the PSLRA, a plaintiff must "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind' with respect to each act or omission." *In re Apple Computer, Inc.*, 127 F. App'x 296, 299 (9th Cir. 2005) (quoting 15 U.S.C. § 78u–4(b)(2)). To "act[] with the required state of mind" means to make false or misleading statements "either intentionally or with deliberate recklessness." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014) (emphasis omitted). "Deliberate recklessness means that the reckless conduct 'reflects some degree of intentional or conscious misconduct.'" *Id.* (quoting *S. Ferry LP, No.2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008)). A defendant acts with deliberate recklessness where he has "reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Id.* (quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010)). To plead a strong inference of deliberate recklessness, a plaintiff must allege "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *See Zucco*, 552 F.3d at 991 (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 976 (9th Cir. 1999), *as amended* (Aug. 4, 1999)). "[F]acts showing mere recklessness or a motive to commit fraud and opportunity to do so" are insufficient to plead a strong inference of deliberate recklessness. *Id.*

After the Supreme Court's decisions in *Tellabs* and *Matrixx*, the Ninth Circuit may consider "whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter," but, if none suffice, must "conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *See Zucco*, 552 F.3d at 992; *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323–24 (2007); *Matrixx*, 563 U.S. at 48; *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 703 (9th Cir. 2012). In determining whether a plaintiff has alleged facts giving rise to a strong inference of scienter, "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 323–24. The inference of scienter need not be the most plausible inference, but it must be "strong in light of other explanations." *Id.* at 324. In sum, a complaint sufficiently alleges scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

Where, as here, Plaintiff fails to plead particularized facts indicating that Defendants' statements were materially false or misleading, it is difficult to imagine how Plaintiff could, at the same time, adequately plead Defendants[12] acted intentionally or with deliberate recklessness in making the purportedly false or misleading statements. *See In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1018 (S.D. Cal. 2005) (stating that falsity and scienter "are generally inferred from the same set of facts"). For example, one of the reasons that the Court concludes that Plaintiff fails to allege any materially false or misleading statements or omissions is that Plaintiff fails to state with

---

[12] Where a plaintiff's claims "are based upon statements by [] individual defendants and in official filings signed by [] individual defendants," it is generally "necessary to require scienter as to the individuals who were responsible for the statements" in order to impute scienter to a corporation. *See In re Maxwell Techs., Inc. Sec. Litig.*, 18 F. Supp. 3d 1023, 1032 (S.D. Cal. 2014); *In re Apple Computer, Inc.*, 127 F. App'x at 303.

particularity that the 810 suffered from what Plaintiff concludes were "abnormal" thermal issues, and suffered those problems throughout the entire period during which Plaintiff alleged Defendants made actionable misstatements—such as prior to and after the chip was utilized in commercial devices. If Plaintiff does not adequately plead that the 810 suffered from such problems, particularly at the time of the alleged misstatements, Plaintiff cannot, based on the same allegations, adequately allege Defendants knew of the problems or their severity, or had "reasonable grounds to believe [omitted] material facts existed" regarding such problems. *See Reese v. Malone*, 747 F.3d at 569. The Court faces the same conundrum with respect to Plaintiff's allegations that Defendants knew or were deliberately reckless in not knowing that Samsung decided against using the 810 because of overheating issues, that "other OEMs were concerned about using the 810 chipset in their devices," or that LG "backtracked" regarding its plan to use the 810 in its G4 devices because the 810 had allegedly overheated in its G Flex 2.

Further, when relying on information gleaned from confidential witnesses to plead scienter, Plaintiff must make stronger allegations regarding those witnesses' personal knowledge to comport with *Zucco Partners, LLC v. Digimarc Corporation*, 552 F.3d 981 (9th Cir. 2009), *as amended* (Feb. 10, 2009).

Even when construing all of Plaintiff's allegations together and viewing the FAC holistically, the allegations do not give rise to a cogent and compelling inference that Qualcomm intentionally or with deliberate recklessness made any false or misleading statements. As pleaded, an inference that Defendants acted with scienter is not as compelling as "alternative innocent explanation[s]," such as that Defendants did not believe or know that the chip continued to have "abnormal" or "severe" overheating issues, or would and did overheat in commercial devices, or that Samsung and LG decided not to use the 810 in certain devices due to overheating. *See Zucco*, 552 F.3d at 1006. Accordingly, the Court finds Plaintiffs' allegations regarding scienter insufficient.

//

//

*C. Whether Plaintiff Adequately Pleads Loss Causation*

"[L]oss causation refers to the causal relationship between a material misrepresentation and the economic loss suffered by an investor." *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014), *as amended* (Sept. 11, 2014). In other words, to make out a private securities fraud claim, a plaintiff must allege "some causal connection between the fraud and the securities transaction in question." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005). "The misrepresentation need not be the sole reason for the decline in value of the securities, but it must be a 'substantial cause.'" *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *In re Daou*, 411 F.3d at 1055). Neither the PSLRA nor the Federal Rules require loss causation to be pleaded with particularity. *See Metzler*, 540 F.3d at 1062.

Here, Defendants argue none of the three "corrective disclosures" that Plaintiff describes actually revealed fraud because they did not reveal that the commercial version of the 810 was predisposed to overheat or that Samsung decided not to use the chip because of overheating. However, regarding the first disclosure, the Bloomberg article dated January 20, 2015 stated that Samsung planned to use its own chip in its Galaxy S6, instead of the 810, which had reportedly overheated during Samsung's testing. *See* FAC ¶¶ 104, 176. Plaintiff alleges Defendants misrepresented that Samsung dropped the 810 due to its propensity to overheat. Even if the article or the circumstances also provide other reasons for a decline in the value of the common stock, Plaintiff sufficiently alleges the common stock price dropped in substantial part due to the article's revelation that Samsung would not be using the chip and that the chip had reportedly overheated during the company's testing. After all, Plaintiff need not allege loss causation with particularity.

On January 28, 2015, the FAC alleges, Qualcomm issued a press release lowering its outlook for the QCT division due to "[e]xpectations that [the] Snapdragon 810 processor w[ould] not be in the upcoming design cycle of a large customer's flagship device[.]" *See* FAC ¶ 237. Due to the similarities in the content of the Bloomberg article

and the January 28, 2015 press release and their proximity in time, it is reasonable to infer that readers would interpret the press release as confirming some, if not all, of the information in the Bloomberg article. Where the Court must draw all reasonable inferences in the Plaintiff's favor, Plaintiff pleads a plausible loss causation theory regarding the second disclosure.

Regarding the third disclosure, on July 22, 2015, Qualcomm announced that it "*again* reduced its guidance for its 'semiconductor business, QCT, in the fiscal fourth quarter compared to our prior expectations[,] ***driven primarily*** by factors impacting premium-tier demand, including: increased concentration within the premium tier causing reduced demand for certain OEM devices that include our chipset; lower demand for our premium-tier chipsets from a vertical customer [*i.e.*, Samsung]; and lower sell through in China of certain handset models using our premium-tier chipsets.'" *See* FAC ¶ 184.

However, Defendants' mere reduction in outlook does not reveal a prior fraud. "[O]ur precedent requires a securities fraud plaintiff to allege that the market 'learned of and reacted to the *fraud*, as opposed to merely reacting to reports of the defendant's poor financial health generally.'" *Loos*, 762 F.3d at 887 (quoting *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008)) (emphasis added) (internal alterations omitted). Accordingly, regarding the final disclosure, Defendants' argument that Plaintiff fails to link economic losses to disclosure of the alleged fraud is convincing. *See also In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392, 394 (9th Cir. 2010) ("Loss causation requires more than an earnings miss."). Plaintiff does not allege that Defendants made false or misleading statements regarding how well devices which included the 810 would sell; rather, according to the FAC, Defendants limited their statements to comments that the 810 would be included in many devices. Also, the third disclosure does not mention the 810's alleged propensity to overheat—the issue at the heart of Plaintiff's claims.

Accordingly, Plaintiff has sufficiently alleged loss causation as it relates to disclosures made in the January 20, 2015 Bloomberg article and January 28, 2015 press release, but not with regard to Qualcomm's July 22, 2015 statement.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motion to dismiss and **DISMISSES** Plaintiff's claims without prejudice and with leave to amend. Plaintiff must file a Second Amended Complaint (SAC), if any, on or before **March 3, 2017**.

**IT IS SO ORDERED.**

Dated: January 26, 2017

Hon. Michael M. Anello
United States District Judge