# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 3226701 CANADA, INC., <br><br> Plaintiff, <br><br> v. <br><br> QUALCOMM, INC., et al., <br><br> Defendants. | Case No.: 15cv2678-MMA (WVG) <br><br> **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT** <br><br> [Doc. No. 61] |

Defendants Qualcomm, Inc. ("Qualcomm"), Steven M. Mollenkopf, Derek K. Aberle, Venkata S.M. Renduchintala, Cristiano R. Amon, and Tim McDonough (collectively, "Defendants") move to dismiss Lead Plaintiff Public Employees Retirement System of Mississippi's Second Amended Complaint ("SAC") for failure to state a claim under Federal Rules of Civil Procedure 9(b) and 12(b)(6), as well as under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4. Doc. No. 61 ("MTD"). After entertaining the oral arguments of counsel, the Court took the motion under submission for further review and consideration. *See* Doc. No. 73. For the reasons set forth below, the Court affirms its tentative ruling in part, and **GRANTS IN PART AND DENIES IN PART** Defendants' motion to dismiss.

## PROCEDURAL HISTORY

On November 30, 2015, Plaintiff 3226701 Canada, Inc. filed this putative securities fraud class action alleging claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., as amended by PSLRA, and

Rule 10b-5, 17 CFR 240.10b-5, against Qualcomm and various directors, officers, and/or employees of Qualcomm. Doc. No. 1 ("Compl."). On February 19, 2016, the Court appointed the Public Employees Retirement System of Mississippi ("Mississippi"), a member of the putative class, as lead plaintiff[1] and approved Mississippi's selection of co-lead counsel and liaison counsel. Doc. No. 9. On April 29, 2016, Plaintiff filed a First Amended Complaint ("FAC"). Doc. No. 26 ("FAC"). On June 28, 2016, Defendants filed a motion to dismiss the FAC for failure to state a claim under Rules 9(b) and 12(b)(6), as well as the PSLRA. Doc. No. 35. On January 27, 2018, the Court granted Defendants' motion to dismiss, finding that the FAC failed to adequately plead falsity, scienter, and, in part, loss causation. Doc. No. 55 ("Order"). The Court granted Plaintiff leave to amend an SAC. *Id.*

On March 17, 2017, Plaintiff filed an SAC. Doc. No. 58 ("SAC"). On May 8, 2017, Defendants timely filed the instant motion to dismiss the SAC for failure to state a claim under Rules 9(b) and 12(b)(6), as well as the PSLRA. MTD. The parties requested an extended briefing schedule for the motion to dismiss, which the Court granted. Doc. Nos. 62, 63. Plaintiff filed an opposition [Doc. No. 66 ("Oppo.")] and Defendants filed a reply [Doc. No. 68 ("Reply")].

On October 6, 2017, Plaintiff filed an unopposed *ex parte* motion to withdraw paragraphs 116 and 117 from the SAC and asked the Court to disregard any references to, statements based on, or allegations relying on these paragraphs. Doc. No. 70. On October 10, 1017, the Court granted the unopposed *ex parte* motion. Doc. No. 71.

## BACKGROUND

Because this matter is before the Court on a motion to dismiss, the Court must accept as true the allegations set forth in the SAC, but in doing so, does not make any findings of fact. *See Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 740 (1976).

---

[1] Hereinafter, any reference to "Plaintiff" refers to the lead plaintiff, Public Employees Retirement System of Mississippi.

## 1.  *Overview*

The gravamen of the SAC is that Defendants made false or misleading statements and/or omissions during the Class Period concealing the debilitating overheating problems with Qualcomm's Snapdragon 810[2] ("810"), which caused Qualcomm's most important 810 customer, Samsung Electronics Co., Ltd. ("Samsung"), to reject the 810 for use in the Galaxy S6.  Specifically, Defendants' representations "repeatedly touting the power, speed, functionality, and overall success of the Snapdragon 810 processor, denying that the Snapdragon 810 had any abnormal thermal issues, and denying that OEMs were encountering problems with and abandoning the 810 because of those overheating problems" were highly material to investors.  SAC ¶ 212.  Plaintiff alleges Defendants' conduct violated Sections 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5.  Plaintiff defines the putative Class Period as November 19, 2014 to July 22, 2015, and the putative Class as "all persons and entities that, during the class Period, purchased or otherwise acquired the publicly traded common stock of Qualcomm and were damaged thereby."  SAC at Introduction, ¶ 351.

## 2.  *Parties and Relevant Non-Parties*

Defendant Qualcomm "develops, designs, licenses, and markets worldwide its digital communications products and services, primarily through its two main business segments; Qualcomm CDMA Technologies ("QCT") and Qualcomm Technology Licensing."  SAC ¶ 31.  One aspect of Qualcomm's business is to sell microprocessors to Original Equipment Manufacturers ("OEMs")—companies that manufacture the final mobile device product, such as Samsung and LG.  SAC ¶ 3 at n.1.  Qualcomm's stock is public on the NASDAQ stock market.  SAC ¶ 50.

Defendant Mollenkopf has been the Chief Executive Officer ("CEO") of Qualcomm since March 2014, and was the President and Chief Operating Officer

---

[2] The 810 is a microprocessor used in smartphones and other mobile devices.

("COO") from November 2011 to March 2014. SAC ¶ 32. Defendant Aberle has been the President of Qualcomm since March 2014. SAC ¶ 34. Defendant Renduchintala was an Executive Vice President and Co-President of Qualcomm's QCT division at all relevant times. SAC ¶ 35. Defendant Amon serves as the Executive Vice President of Qualcomm and is Co-President of QCT. SAC ¶ 37. Defendant McDonough serves as a Senior Vice President of Global Marketing at Qualcomm and served as the Vice President of Worldwide Marketing for Qualcomm during the Class Period. SAC ¶ 38.

Although not parties to the instant action, the SAC cites allegations made by nine confidential witnesses ("CWs") and references Samsung and Rajeev Pal throughout the SAC. CW1 was formerly a Qualcomm software engineer from 2004 through November 2015. CW1 "worked in Qualcomm's Digital Signal Processor ("DSP") program, which worked on the Snapdragon 810." SAC ¶ 39. CW2 was formerly a Qualcomm Senior Staff Engineer in San Diego, who worked for Qualcomm for eight years and "interacted regularly with OEMs Samsung, LC, and Sony to coordinate the launch of the Snapdragon 810" in the OEMs' products. SAC ¶ 40.

CW3 was formerly a Qualcomm Senior Staff Engineer who worked for Qualcomm for 20 years. SAC ¶ 41 During the Class Period, CW3 "was responsible for assessing product test needs for upcoming chipsets, including test planning, special test requirements, and IT resource planning." *Id.* CW3's team "was responsible for conducting thermal testing on the Snapdragon 810 chipset and was also responsible for aggregating weekly test results and reports for the 810 from members of the Product Test Group and submitting those test results to Pal," who sent them to Defendant Renduchintala and others. *Id.* CW3 reported to the Head of Product Testing, who reported to the Vice President of Engineering, who reported to Qualcomm's "SVP of Engineering in the QCT segment, who in turn reported to James 'Jim' Thompson, who in turn reported to [Defendant] Renduchintala." *Id.* CW3 knew "about testing of all QCT chipsets, (including the 810), including allocation of resources (both human and

financial) necessary for all stages of testing, and comparative performance of Qualcomm chipsets based on testing results." *Id.*

CW4 was formerly a Qualcomm Technical Director of Engineering for over 15 years and was the lead engineer responsible for the Linux Kernel platform on the 810 during the Class Period. SAC ¶ 42. CW5 was formerly a Customer Support Engineer who worked for Qualcomm in Tokyo, Japan for two years. SAC ¶ 43. CW5 communicated and supported Japanese OEMs, including Sony, Sharp, and Fujitsu. *Id.* CW5 "personally communicated customer complaints regarding the 810 to [Qualcomm] Customer Support Engineers . . . regarding potential solutions for the 810's thermal and battery consumption issues." *Id.*

CW6 was formerly Qualcomm's Vice President of Engineering who oversaw a team that worked with OEMs, including, Samsung, Sony, LG, HTC, and Xiaomi, to implement the 810 in their devices. SAC ¶ 44. CW7 was formerly a Sony Senior Software Engineer who tested and verified interface protocols for Sony Mobile Communications during the Class Period. SAC ¶ 45. CW7's responsibilities included verifying, testing, and debugging the log files for Sony's devices for sale by Verizon, including phones within the Xperia series. *Id.*

CW8 was formerly a Senior Engineer at Qualcomm who worked in the Applications Processor Test Unit ("APT Unit") and was responsible for testing audio, video, and media applications on Qualcomm processors for OEMs such as LG. SAC ¶ 46. CW8 worked on the Snapdragon 800 and 805 processors and interacted with members of the APT Unit who worked on the 810. *Id.* CW9 was a Director of Engineering at Qualcomm. SAC ¶ 47. CW9 spoke to members of the Linux Kernel team for the Snapdragon 810 about the thermal issues that the 810 was experiencing. *Id.*

Rajeev Pal was the Project Engineer for the Snapdragon 810. SAC ¶ 49. He was the Qualcomm employee to whom CW2 reported to and to whom CW3 forwarded product testing results. *Id.* CW2 states that Pal reports to Defendant Renduchintala. *Id.*

CW3 states that "all 810 data flowed through" Pal, who "regularly reported the progress of the 810 directly to" Defendant Renduchintala. *Id.*

Samsung "is a multinational electronics company headquartered in Suwon, South Korea." SAC ¶ 48. "Samsung designs, manufactures and sells, among other things, consumer electronics, such as smartphones, and electronic components, such as silicon semiconductors (including microprocessors like the Snapdragon 810)." *Id.* Thus, Samsung is both a customer and competitor of Qualcomm, as Samsung historically purchased Qualcomm's microprocessors, but also designed and manufactured its own microprocessors as well. *Id.*

### 3.  *Factual Allegations*

In 2007, Qualcomm developed a series of all-in-one mobile processors known as "System on a Chip" ("SoC"), called the Snapdragon series.[3] SAC ¶ 55. Prior to the development of the SoC, most mobile devices had several different mobile processors tailored to perform specific functions. *Id.* The SoC "aggregates all of the mobile processors or 'functional blocks' onto a single piece of silicon, which allows the smartphone to maximize its data processing speed, improving power efficiency and creating an overall enhanced user experience, and leading to the development of (and demand for) thinner and smaller smartphones." *Id.* The Snapdragon series were flagship products for QCT and Qualcomm. SAC ¶ 330. They were included in over one billion devices shipped by 2014 and dominated the mid-to-premium-tier smartphone markets in the United States, Europe, and China. *Id.*

Different functions of a mobile device are performed by different "functional block[s]" of an SoC. SAC ¶ 56. The central processing unit ("CPU") of a mobile device "governs how quickly a smartphone can perform various functions, sometimes simultaneously." SAC ¶ 57. Modern SoC CPUs have multiple cores, which are units

---

[3] The SAC also refers to these series' of processors as chipsets.

that work in concert within a mobile device's CPU functional block to regulate the CPU's operations for more efficient processing. *Id.* The CPU on the SoC "is more likely to emanate heat than the other functional blocks . . . because it processes data by utilizing the electrical energy from billions of transistors to digitize the data signals." SAC ¶ 58. The electrical energy creates heat within the SoC and causes the smartphone the SoC is implanted in to feel warm to the touch when used for an extended period of time. *Id.* When the heat becomes excessive, it threatens the stability of the CPU, the SoC, the smartphone, and the user's skin. *Id.* At that point, the software controlling the SoC shuts down the CPU or one or more of its cores to prevent further damage, which "slows down the SoC's overall processing speed and efficiency until the smartphone cools down." *Id.* This is known as "throttling." SAC ¶ 59. While throttling may prevent thermal damage, it also "may result in sub-par user experience: the SoC may process data at noticeably slower speeds or the smartphone may automatically reset or even restart at random intervals." *Id.* Therefore, if a CPU consistently generates excessive heat, the smartphone will not perform as advertised or designed. *Id.*

In mid-2013 and prior to the start of the Class Period, Qualcomm began developing the Snapdragon 810, which was to be its "Cadillac" processor. SAC ¶¶ 62, 63. The 810 was designed to improve power efficiency, processing speeds, and technical capabilities, including the ability to seamlessly connect to 4G/LTE networks. SAC ¶ 62. Qualcomm planned to launch the 810 in January 2015 and was intended to be commercially available for at least two years before the launch of its successor. SAC ¶ 63. Qualcomm identified smartphones in which the 810 would be incorporated so that it could design the processor to match the technological specifications and capabilities of those devices. SAC ¶ 64.

Qualcomm was particularly interested in incorporating the 810 into Samsung's Galaxy S6. *Id.* Samsung used Qualcomm's chips in many of its flagship devices, but designed and used its own SoCs for non-flagship devices. *Id.* Since 2011, Samsung used a Snapdragon SoC in every series of the flagship Galaxy S device. *Id.* Samsung

accounted for more than 10% of Qualcomm's consolidated revenues in the fiscal years of 2011, 2012, and 2013. SAC ¶ 65. According to CW2, in 2013, Samsung demanded that Qualcomm have the 810 commercially ready in November 2014 and threatened to use its own in-house SoC if Qualcomm could not make that deadline. SAC ¶ 66. In response, Qualcomm expedited its production timeline. *Id.*

Originally, Qualcomm designed the 810 "to be fabricated in a 20 nm node utilizing a 32-bit processor."[4] SAC ¶ 67. However, in September 2013, Apple revealed an iPhone with a 64-bit processor, which processes data at double the rate of a 32-bit chipset. SAC ¶ 68. Given Qualcomm's leadership position in the SoC industry, "the market expected and anticipated that the 810 would be the preeminent 64-bit SoC on the market." SAC ¶ 332. "Less than two weeks after Apple's announcement, Samsung announced that it would be adopting 64-bit architecture in its upcoming Galaxy S6." SAC ¶ 69. Thus, by no later than December 2013, Defendant Renduchintala decided Qualcomm must make the 810 a 64-bit chipset, and in January 2014, the industry media reported this decision. *Id.*

## A. Testing the Snapdragon 810

In March 2014, Qualcomm began extensively testing the 810 and, in late April and early May of 2014, Qualcomm began extensive thermal testing. SAC ¶¶ 73, 76. Defendants were informed of the 810's progress at every step through regular reports, meetings, and conference calls. SAC ¶ 73. Early testing revealed that the 810 "was suffering from serious and debilitating overheating problems that continued unabated through its commercial launch in 2015." SAC ¶ 73. "CW 3 and CW 4 identified two key performance metrics that Qualcomm analyzed when testing the 810: (i) Crashes Per Thousand Hours (of testing) ("CPTH"), and (2) Mean Time Between Failures ("MTBF")," which tested the stability of the chipset. SAC ¶ 77. A stable chipset has a

---

[4] "32-bit" refers to the speed at which a chipset can process data. "20 nm" refers to the size, in nanometers, of each of the multitude of transistors included within a given mobile processor.

15cv2678-MMA (WVG)

higher MTBF and a lower CPTH, meaning that the chipset runs longer between failures, with fewer crashes over the testing period. *Id.* Around May or June 2014, QCT began specifying and identifying the number of crashes caused by the 810's overheating as a result of the severity of the 810's thermal issues. *Id.*

The March 2014 Product Test Group tests revealed the 810's CPU was overheating. SAC ¶ 80. Although not abnormal at this stage, documents reviewed by CW3 at the Commercial Shipment Readiness Review ("CSRR")[5] process indicated that Qualcomm had not resolved the overheating problems by December 2014. *Id.* CW3 sent weekly emails containing test results, including the number of crashes and issues identified with the most recent software builds, to a "wide distribution list within the Company, including to his supervisor's boss, VP Rashmi Chari." SAC ¶ 79. CW3 believes Pal had access to the content of those emails and was providing the information to Defendant Renduchintala, and that the data was used in presentation to "executive teams." *Id.*

The thermal issues continued during the Feature Stage ("FS") in 2014, and Defendants were "regularly apprised thereof through written reports and oral presentations." SAC ¶ 83. Specifically, Qualcomm disseminated, "*inter alia*, (i) Daily Audit Logs; (ii) Product Development Test Reports; (iii) Sub-System Reports; (iv) Root Cause Analysis Reports; and (v) Thermal Engineering Test Reports, all of which demonstrated that the 810 was exhibiting abnormal thermal problems." *Id.*

According to CW4, "Qualcomm performed extensive software testing [in late April or early May of 2014] on the 810 to determine whether the chip was working properly, including with respect to its power, performance, and stability." SAC ¶ 84.

---

[5] Prior to shipping the chipsets to OEMs, and after testing is completed, Qualcomm would hold CSRR meetings to determine whether the 810 was ready to be mass produced and shipped to OEMs. SAC ¶ 118. According to CW3, representatives at the meetings discussed testing benchmarks, including the 810's score on CPTH and MTBF, as well as the number of crashes due to the 810 overheating. SAC ¶ 119.

CW4 reported that Qualcomm tested the 810 on Mobile Test Protocol ("MTP") devices, which CW 3 explains are two or three times the size of a typical mobile device and therefore better at dissipating heat. *Id.* Due to the size of MTPs, the 810 should perform better than the typical smartphone during testing. *Id.* CW4 reported that Qualcomm tested the 810 overnight in thousands of MTPs in various locations. *Id.* The overnight test results were maintained on a computerized "Daily Audit Log," which provided insight into what was causing the 810 to fail in the MTP tests. SAC ¶ 85. According to CW4, the MTP test results indicated abnormally high CPTH, crashing up to 1,000 times per night. *Id.* Additionally, CW4 reported that the 810 never met certain MTBF thresholds and would not last more than an hour without failing. *Id.* CW4 reported that the "number of crashes due to overheating was so unprecedented that Qualcomm created a special reporting metric to identify and isolate the number of crashes caused by the 810 overheating." SAC ¶ 87. The new metric was provided to Defendants Renduchintala and Amon, among others, prior to the Bi-Weekly Executive Meetings and in the CSRR materials circulated prior to these meetings. *Id.* The Daily Audit Logs identified overheating as the biggest root cause of the crashes in the MTP tests. *Id.*

The Daily Audit Logs were consolidated into Product Development Test Reports ("PDT Report"). SAC ¶ 86. These were generated daily and after a milestone was reached for a specific software build, and were often sent to Defendants Rendunchintala and Amon by senior Vice Presidents. *Id.* The PDT Reports were also consolidated and presented to Defendant Rendunchintala, and sometimes Defendant Amon, during weekly executive meetings. *Id.* According to CW4, the PDT Report "contained several key metrics related to thermal testing, including CPTH and MTBF." *Id.* CW2 confirmed that reports addressing the 810's thermal issues were generated daily. SAC ¶ 88. Both CW2 and CW4 further confirmed that they received "Root Cause Analysis Reports" and that CW3 and CW4 received "Thermal Engineering Test Reports." *Id.* Both of these reports documented the 810's thermal issues and were sent to Qualcomm management. *Id.*

Qualcomm engineers and executives also met frequently to discuss the 810's thermal issues, "*inter alia*, (i) Daily Target Scrum Meetings, (ii) Daily Team Lead Meetings, (iii) Weekly Status Meetings, (iv) Weekly Principals Meeting, and (v) Bi-Weekly Executives Meetings." SAC ¶ 89. Pal and Rajeev Prabhakaran attended the Daily Team Lead Meetings, and were therefore aware of the overheating issues and MTP crashes. SAC ¶ 91.

Beginning in at least May 2014, Qualcomm held "Weekly Status Meetings," during which the Weekly Status Reports were presented and the status of the 810's progress was discussed. SAC ¶ 92. Also beginning in May 2014, Pal gave Defendant Renduchintala updates regarding the 810 during "Weekly Principals Meetings," where slides were presented to show Defendant Renduchintala and others the issues facing the 810 during testing. SAC ¶ 93. CW2 was present or telephonically present for some of these meetings. *Id.* Also in May 2014, QCT executives, including Defendant Renduchintala, Tony Schwartz, Pal, and sometimes Defendant Amon, discussed the 810 at "Bi-Weekly Executive Meetings," during which Schwartz would distill the key points from the PDT Reports. SAC ¶ 94. CW4 was personally present at these meetings and reported that the 810's thermal issues were discussed. *Id.* Prior to these meetings, Defendants Renduchintala and Amon received emails containing summaries of issues to be discussed and raw testing data for the 810. SAC ¶ 95. CW4 reported that the 810's thermal issues were highlighted in these emails and indicated the "number of crashes, failures and resets specifically attributable to the 810's overheating problems." *Id.* Copies of these emails were also distributed during the meetings. *Id.*

In June 2014, CW2 became aware that the 810 "was experiencing more severe than normal thermal issues." SAC ¶ 96. CW2 believed that Defendant Renduchintala was aware of the thermal issues by then because Pal provided Defendant Renduchintala with information regarding the 810 and Defendant Renduchintala "allocated[] additional resources to address the thermal issues." *Id.* CW4 reported that Defendants Renduchintala and Amon would have also been aware of the thermal issues by virtue of

their attendance and receipt of materials at the Bi-Weekly Executive Meetings. SAC ¶ 97.

During the second half of 2014, increased testing and reporting within Qualcomm and by OEMs confirmed that the 810 was still experiencing unrelenting and serious thermal issues. SAC ¶ 98. By July 2014, CW3 said that "everyone was in a panic" regarding the "issues plaguing the 810." *Id.* According to CW3, Qualcomm was testing 10 times more software builds for the 810 than any other chipset, and testing them 10 times as often. SAC ¶ 99.

## B. *OEMs' Issues with the 810*

In the summer of 2014, Qualcomm began a three month long Commercial Sampling[6] and granted OEMs, including Samsung, LG, and HTC, access to the 810. SAC ¶ 100. Qualcomm had the option to modify the 810 based on the OEMs' test results. *Id.* Rumors began circulating in August 2014 among the OEMs that the 810 had thermal issues. SAC ¶ 101. OEM customer testing reports indicated overheating and instability. *Id.* According to CW6, "Samsung specifically raised with Qualcomm the 810's overheating issues that Samsung experienced during testing of the chip." *Id.* Qualcomm attempted to determine whether the overheating was caused by the 810 or the OEMs' devices. SAC ¶ 102. "[I]n every instance, Qualcomm confirmed that the thermal issues were not caused by the OEMs' mobile device designs." *Id.* Other OEMs also determined that their mobile devices were not causing the thermal issues. SAC ¶ 101.

According to CW2, Defendant Renduchintala raised questions regarding the thermal issues between September and November 2014, causing Pal to have conference calls with CW2, and sometimes Defendant Renduchintala. SAC ¶ 104. In one September 2014 call, Pal referred to the 810 as a "piece of crap." *Id.* On another call, CW2 remembers Defendant Renduchintala asking what the root cause of the overheating

---

[6] Commercial Sampling means releasing samples of the 810 to OEMs so that they could test the 810 on their prototype devices. SAC ¶ 100.

was. *Id.* According to CW8, by late 2014 the 810's overheating and power consumption issues "were common knowledge" and "everyone knew about it." SAC ¶ 105.

According to CW6, Samsung specifically raised the 810's overheating issues that the OEM experienced during its testing of the chip and decision over whether to use it in the Galaxy S6 with Qualcomm. SAC ¶ 111. In August 2014, CW2 reported that Samsung was aware of the 810's thermal issues and was planning on using its own chip instead of the 810 for the Galaxy S6. SAC ¶ 108. In October 2014, CW2's Samsung counterpart confirmed that Samsung "planned to abandon the 810 because of its thermal issues." SAC ¶ 109. Within the next two weeks, Defendant Renduchintala confirmed to CW2 that Samsung was planning on abandoning the 810. SAC ¶ 110. In early 2015, CW8 learned that Samsung abandoned the 810 because of its overheating issues. SAC ¶ 112.

In late 2014 and after Commercial Sampling was complete, Qualcomm conducted CSRR meetings to discuss whether the 810 was ready to be mass produced and shipped to OEMs. SAC ¶ 118. Defendant Renduchintala, Scwhartz, and sometimes Defendant Amon attended these meetings. *Id.* The 810's overheating issues were among the "key testing metrics discussed" at these meetings. SAC ¶ 119. Many of the CSRR meetings in November and December 2014 discussed the abnormally high CPTH and abnormally low MTBF test results, indicating continued overheating issues. SAC ¶ 120. Despite these test results, Defendants decided to commercially produce the 810. *Id.*

Between December 2014 and January 2015, several articles were published that questioned whether Samsung would use the 810, reported that the 810 overheats, and posited that other OEMs might abandon the 810. SAC ¶¶ 122-200. Defendants denied these allegations. SAC ¶¶ 123, 124. After the close of trading on January 20, 2015, *Bloomberg* published an article titled "Samsung Said to Drop Qualcomm Chip from Next Galaxy S." SAC ¶ 272. Neither Qualcomm nor Samsung confirmed or denied the report. *Id.* After *Bloomberg's* article, Qualcomm common stock declined by $0.89 per share, or 1.23%, from $72.48 per share at the close of trading on January 20, 2015, to a close of

$71.59 per share on January 21, 2015. SAC ¶ 275. "Analysts attributed the 1.23% decline to *Bloomberg's* unconfirmed report that Samsung would not use the Snapdragon 810 in the Galaxy S6." SAC ¶ 276. On January 28, 2015, Qualcomm announced in a press release that they expected a large customer would not use the 810 in its flagship device. SAC ¶¶ 130, 279. As such, Qualcomm stated that it would have to lower "outlook for the second half of fiscal 2015 in our semiconductor business, QCT." SAC ¶ 279. Qualcomm did not confirm that the large customer was Samsung and that the flagship device was the Galaxy S6 until May 2015. SAC ¶ 130. Following this press release, the price of Qualcomm common stock declined by $7.30 per share, or 10.28%. SAC ¶ 282. Analysts attributed this decline in stock price to Qualcomm's revelation that a large customer would not use the 810 in its flagship device. SAC ¶ 283.

Unlike Samsung, many other OEMs, including LG, did not have the ability to produce their own chip, and therefore had to use the 810 to meet production deadlines despite the thermal issues. SAC ¶ 136. LG launched the G Flex 2 smartphone with the 810 on January 5, 2015. SAC ¶¶ 141, 143. CW2 and CW3 recall that immediately following the release of the G Flex 2, users complained that their smartphones were operating slowly and resetting. *Id.* Many of the users determined that the issues were related to the 810 by using commercially available applications that benchmark the performance of a phone's speed and thermal levels. *Id.* In late January, the *Wall Street Journal* and *Android Authority* reported that LG admitted running into issues with the 810 and were attempting to work around the 810's heat emission. SAC ¶¶ 143, 144. On April 28, 2015, LG revealed its next flagship device, the G4, would use the Snapdragon 808, a less powerful chip that runs 50% slower than the 810. SAC ¶¶ 145, 146, 147. According to CW2 and an October 7, 2015 *Softpedia* article, LG originally contemplated using the Snapdragon 810 for the G4, but decided to use the 808 "after the G Flex 2 had experienced overheating problems due to the 810" and because the 808 generates less heat. SAC ¶ 146.

15cv2678-MMA (WVG)

On March 2, 2015, HTC unveiled the One M9 flagship device with the 810.  SAC ¶ 150.  The One M9 "was widely reported to have overheating problems." *Id.*  On the date of the One M9's launch, HTC attempted to run an Antutu Benchmark test.  *Id.*  Before the test could record a score, the following message popped up on the One M9: "The device temperature is too high.  Please test again after cooling the device.  Continued testing may cause the system to restart or shut down."  *Id.*  On March 16, 2015, *9to5 Google* reported that the One M9 shows 131 degree surface temperature while running the GFXBench and confirmed that the overheating was due to the 810.  SAC ¶ 151.  On that same day, *Droid Life* reported that the One M9 "runs insanely hot" and is even hotter than scalding bath water.  SAC ¶ 153.  On March 30, 2015, *ArsTechnica* reported that "the rumors of the 810s [sic] heat issues seem based in reality."  SAC ¶ 154.

On April 23, 2015, *ArsTechnica* published an article titled "In-depth with the Snapdragon 810's Heat Problems; this is a hot chip that throttles early and often, and it makes a difference."  SAC ¶ 156.  The article stated that LG's G Flex 2 and HTC's One M9 run hot, which slows performance down quickly and stated that "after running for a very short period – *e.g.*, 30 seconds – the auto-shutdown feature for the four largest cores . . . kicked in."  *Id.*  The article further reported that "the 810 throttles so quickly that the 805 and even the 801 can beat the 810 when performing sustained workloads."  SAC ¶ 157.  The article concluded that the Exynos 7 chip used by Samsung in the Galaxy S6 in lieu of the 810 is "a better-behaved chip all around."  SAC ¶ 159.

On March 26, 2015, Chinese Manufacturer ZTE released the Nubia Z9 Max, which used the 810, as its new flagship device.  SAC ¶¶ 161, 162.  On June 10, 2015, *XiaomiToday* reported that the Nubia Z9 Max was "overheating like crazy."  SAC ¶ 162.  Axon announced the Axon Pro a month later, touting it as its first phone "designed in the U.S. for the U.S."  SAC ¶ 163.  However, the Axon Pro "was plagued by overheating issues from the 810."  *Id.*  On August 5, 2015, *Mashable.com* reported that the Axon Pro reported that the phone's major flaw was the 810.  *Id.*

Beijing based company, Xiaomi, released the 810 in its Mi Note Pro in May 2015, two months after the originally planned release date. SAC ¶ 164. *Softpedia* and others speculated that Xiaomi pushed back the release date to resolve issues with the 810. *Id.* Upon release of the Mi Note Pro, Xiaomi conceded that the 810 generated heat and explained that "[t]o solve the heating issue of Snapdragon 810, our engineers optimized the phone structure to dissipate the heat more evenly." SAC ¶ 166. Xiaomi also decided to push back the release date of its next flagship device, the Mi 5. SAC ¶ 167. A June 18, 2015 *International Business Times* article explained that the Mi 5 struggled with overheating due to the 810, which prompted Xiaomi to wait for Qualcomm's upcoming Snapdragon 820 to use in its next device. *Id.*

Sony utilized the 810 in four of its flagship devices – the Xperia Z3+, Z4, Z5, and Z5 compact. SAC ¶ 165. All of these phones had overheating problems. *Id.* According to CW5, Sony notified CW5 that it was experiencing thermal and power consumption issues with the 810 in its Z4 device. SAC ¶ 169. CW5 and Customer Support Engineers worked closely with Sony during January and February 2015 and CW5 continued communicating with Sony through April 2015. SAC ¶ 171. At Qualcomm's suggestion, Sony attempted to add additional hardware to the device to solve the overheating in the Z4. SAC ¶ 172. According to CW7, Verizon decided not to partner with Sony on its Z3+ or Z4 because of the 810's overheating problems. *Id.* Qualcomm provided Sony with a new version of the 810 (810 v2.1), but overheating issues still persisted in the Z3+. SAC ¶ 175. Several articles discussing the overheating in Sony's smartphones continued to emerge in June and July 2015. SAC ¶¶178-88. Sony took extra precautions to avoid overheating due to the 810 in Sony's Xperia Z5 and was able to lessen overheating in the phone. SAC ¶¶ 189-92. However, overheating issues continued and media outlets reported that the cause was the 810. SAC ¶ 193.

OnePlus' OnePlus 2 smartphone, which incorporated the 810, delayed its commercial launch by seven months to address the 810's overheating issues. SAC ¶ 194. *Engadget* reported on June 18, 2015, that "thermal gel and graphite have been slathered

liberally inside the [OnePlus 2] handset to further dissipate any excess heat." SAC ¶ 195. OnePlus also decreased the speed of the phone to prevent overheating. SAC ¶ 196. Despite these efforts, the OnePlus 2 "continued to feel the effects of the 810's overheating." SAC ¶ 197.

On July 22, 2015, Qualcomm issued a press release announcing that Qualcomm again reduced its guidance for "semiconductor business, QCT, in the fiscal fourth quarter compared to our prior expectations driven primarily by factors impacting premium-tier demand, including: increased concentration within the premium-tier causing reduced demand for certain OEM devices that include our chipset; lower demand for our premium-tier chipsets from a vertical customer; and lower sell through in China of certain handset models using our premium-tier chipsets." SAC ¶ 285. Qualcomm attributed the reduction of QCT guidance in substantial part to the 810's issues and resulting lack of OEM phone sales, and the impact of losing Samsung's flagship Galaxy S6 business. SAC ¶ 286. Defendant Mollenkopf explained that Apple and Samsung together have more than 85% share of premium-tier shipments and OEMs are now pursuing vertically integrated strategies at increased levels. SAC ¶ 287. As a result of the press release, the price of Qualcomm common stock declined by $2.41 per share, or 3.75% from a close of $64.19 on July 22, 2015, to close at $61.78 per share on July 23, 2015. SAC ¶ 288. Analysts attributed the stock price decline to the ongoing performance and overheating issues with the 810, as well as the impact of the loss of Samsung. SAC ¶ 289.

Qualcomm ultimately expedited the creation of the 810's successor, the Snapdragon 820 to replace the 810, and made it commercially available a year ahead of schedule. SAC ¶¶ 206, 207. According to CW4, Defendant Renduchintala ordered an expedited design of and development schedule for the 820 specifically because of the 810's thermal problems. SAC ¶ 207. The 820 "did not feature revolutionary technology" and instead "simply reconfigured cores and transistors of the 810 so that the chip would no longer overheat." SAC ¶ 208. On November 5, 2015, Defendant

McDonough tweeted the "820 is turning out amazing and meeting or beating OEM thermal requirements. You'll feel cool have an 820 phone." *Id.* The 820 restored the relationship between Samsung and Qualcomm and Samsung used the 820 in its Galaxy S7. SAC ¶ 209.

## LEGAL STANDARD

A Rule 12(b)(6) motion tests the legal sufficiency of the claims made in the complaint. Accordingly, dismissal under Rule 12(b)(6) is proper where the complaint fails to set forth a "cognizable legal theory," or where there is "an absence of sufficient facts alleged to support a cognizable legal theory." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001) (citing *Ballistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699). Although a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief" under Rule 8(a)(2), "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations, brackets, and citations omitted). In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all "allegations of material fact," and construe them "in the light most favorable to the nonmoving party." *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996).

Under Rule 9(b), when the complaint includes allegations of fraud, a party must "state with particularity the circumstances constituting fraud or mistake," even though "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "In other words, the complaint must set forth what is false or misleading about a statement, and why it is false." *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009) (internal quotation marks omitted). Additionally, fraud claims made pursuant to the Securities Exchange Act must "plead with particularity both falsity and scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), *as amended* (Feb. 10, 2009). The Ninth Circuit has also

18

held that loss causation must be pleaded with particularity. *Oregon Pub. Emples. Ret. Fund v. Apollo Group Inc.*, 774 F.3d 598, 605 (2014).

**DISCUSSION**

**1.** **_Defendants' Requests for Consideration of Documents Incorporated by Reference and Requests for Judicial Notice_**

In determining the propriety of a 12(b)(6) dismissal, courts generally may not look beyond the complaint for additional facts. *United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003). "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *Id.*; *see also Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

"[E]ven if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Ritchie*, 342 F.3d at 908 (internal citations omitted). A court "may consider a document the authenticity of which is not contested, and upon which the plaintiff's complaint necessarily relies." *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998), *superseded by statute on other grounds in Abrego v. Dow Chem. Co.*, 443 F.3d 676 (9th Cir. 2006); *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007). The "incorporation by reference" doctrine has also been extended "to situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint." *Kneivel v. ESPN*, 393 F.3d 1068, 1077 (9th Cir. 2005).

In deciding Defendants' motion to dismiss, Defendants request the Court consider 43 documents—spanning approximately 318 pages—in addition to the SAC. *See* Doc. No. 61-2. Defendants allege the SAC incorporates by reference the majority of these

documents,[7] and requests the court take judicial notice of all others.  In the alternative, Defendants request the Court judicially notice all 43 documents.  The documents consist of articles that the SAC quotes or refers to, conference call and conference transcripts, SEC filings, analyst reports, press releases, and etcetera.  *See* Doc. No. 61-2 at 3-6 (providing a description of each exhibit); *see also* SAC ¶¶ 13-276.

Defendants explain they provided the full text of these documents "so the Court may consider Plaintiff's citations and allegations in context."  Doc. No. 61-2 at 7. Defendants provide no explanation regarding the purposes for which they seek judicial notice beyond stating that Courts "routinely" take judicial notice of these types of documents.  *Id.* at 7-8.  Plaintiff does not object to Defendants' request to incorporate documents by reference, which include only documents Plaintiff cited to in the SAC. Doc. No. 66-1 at 2.  Plaintiff does object to the Court assuming the truth of the matters stated in some of those documents.[8]  *Id.* at 6.  Plaintiff argues that the SAC only cites to those exhibits because they allegedly contain false and misleading statements, so the contents of the documents should not be accepted for their truth.  *Id.* at 6-8.  Second, Plaintiff objects to the Court drawing adverse inferences from some documents because Plaintiff contends that all factual inferences must be resolved in Plaintiff's favor on a motion to dismiss.  *Id.* at 8.

Having reviewed the exhibits attached to Defendants' request, all exhibits, except for exhibits 24, 29, 30, and 31, are incorporated into the SAC by reference because they are quoted or referred to in the SAC and because Plaintiff does not object.  The Court will not take judicial notice of the remaining documents, as it did not rely on them in reaching the conclusion below that Plaintiff has sufficiently pleaded a private securities fraud action.  Accordingly, the Court **GRANTS** Defendants' request to incorporate exhibits 1-

---

[7] Exhibits 1-23, 25-28, and 32-43.
[8] Specifically, Exhibits 2, 4-5, 8-11, 18-22, 25-28, 34-35, and 37-38.

23, 25-28, and 32-43 into the SAC by reference and **DENIES** Defendants' request to judicially notice exhibits 24, and 29-31.

### *2.   Motion to Dismiss*

Plaintiff alleges causes of action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5.  Section 10(b) "makes it unlawful for 'any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.'"  *See Zucco*, 552 F.3d at 989 (quoting 15 U.S.C. § 78j(b)).  Rule 10b-5, promulgated under the Securities Exchange Act, makes it unlawful "for any person . . . [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  *Id.* at 989-90 (quoting 17 CFR 240.10b-5(c)).  Under section 20(a) of the Securities Exchange Act, "certain 'controlling' individuals" may also be liable for violating section 10(b) so long as a plaintiff sufficiently demonstrates a primary violation of section 10(b).  *Id.* at 990.  Controlling persons are those who "exercised actual power or control over the primary violator."  *See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003).  To plead a primary violation of Rule 10b-5, the plaintiff must plead: "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss."  *In re Daou Sys. Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)).

Defendants move to dismiss both the Section 10(b) cause of action and the 20(a) cause of action.  *See* MTD.  However, Defendants only discuss the 10(b) cause of action because Defendants argue Plaintiff does not sufficiently plead a primary violation under 10(b), and thus Plaintiff does not sufficiently plead the derivative 20(a) claim.  *See id.*

15cv2678-MMA (WVG)

Regarding Plaintiff's claim of a primary violation, Defendants do not dispute that Plaintiff has sufficiently pleaded a connection with the purchase or sale of a security or economic loss. *See id.* Rather, Defendants argue that Plaintiff fails to sufficiently plead any materially false or misleading statements or omissions, and fails to adequately plead scienter and loss of causation. *Id.* at 14. Additionally, Defendants argue that Defendants cannot be held liable for many of the allegedly misleading statements because Defendants did not make those statements. *Id.* For purposes of brevity and because the Court ultimately finds that Plaintiff insufficiently pleads loss causation with respect to the July 22, 2015 corrective disclosure, the Court addresses loss causation before addressing falsity and scienter.

### A.    *Whether Defendants Can be Held Liable for Statements They Did Not Make*

As a threshold argument, Defendants assert that the SAC impermissibly "seeks to hold every Defendant liable for every challenged statement." MTD at 14. Defendant contends that the PSLRA prohibits this type of "group pleading," and that only the "maker" of a statement can be primarily liable for securities fraud. *Id.* at 14-15. Plaintiff opposes Defendants' assertion, stating that "[f]or those statements issued by an Individual Defendant, both that Defendant and Qualcomm are alleged as the 'makers' of the statement with ultimate authority over its contents," "[f]or those misstatements posted on Qualcomm's website without direct attribution to an Individual Defendant, Qualcomm is the maker of those statements," and "for those statements in industry publications attributed to Qualcomm or a Qualcomm spokesperson, Qualcomm is responsible for those statements as well." Oppo. at 32-33 (internal citations and quotations omitted). As a result, Plaintiff concedes that the SAC does not seek to hold "every Defendant liable for every challenged statement." *See* MTD at 14; *see also* Oppo. As such, for purposes of determining whether any Defendants are dismissed as a result of the instant motion, the Court will only attach liability to makers of the statements (including Qualcomm) as to whom Plaintiff sufficiently pleads falsity, scienter, and loss causation.

## B. Whether Plaintiff Adequately Pleads Loss Causation

"[L]oss causation refers to the causal relationship between a material misrepresentation and the economic loss suffered by an investor." *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014), *as amended* (Sept. 11, 2014). In other words, to make out a private securities fraud claim, a plaintiff must allege "some causal connection between the fraud and the securities transaction in question." *In re Daou Sys., Inc.*, 411 F.3d at 1025. "The misrepresentation need not be the sole reason for the decline in value of the securities, but it must be a 'substantial cause.'" *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *In re Daou Sys., Inc.*, 411 F.3d at 1055). The Ninth Circuit has held that "Rule 9(b) applies to all elements of a securities fraud action, including loss causation." *Oregon Pub. Emples. Ret. Fund*, 774 F.3d at 605. Loss causation is established where "the market learns of a defendant's fraudulent act or practice, the market reacts to the fraudulent act or practice, and a plaintiff suffers a loss as a result of the market's reaction." *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 392. A plaintiff can establish that a market became aware of fraud by showing "corrective disclosures," i.e., news or announcements to investors that revealed the company's prior misstatements to have been false or misleading. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016). Disclosures must occur under the right circumstances. For example, news of an investigation only informs the market of fraud "if the complaint also alleged a subsequent corrective disclosure by the defendant." *Id.* at 1210; *accord Loos*, 762 F.3d at 890 (holding that "the announcement of an investigation, without more, is insufficient to establish loss causation"). Thus, where a security lost value on news of the investigation, but then did not respond to a later disclosure by the defendant, one could infer that investors interpreted the investigation as a disclosure of fraud and treated the actual disclosure of fraud as something they already knew. *See Di Donato v. Insys Therapeutics Inc.*, No. CV-16-00302-PHX-NVW, 2017 WL 3268797, at *17 (D. Ariz. Aug. 1, 2017). "[T]he ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Lloyd*, 811 F.3d at 1210.

While the SAC alleges the existence of three partial corrective disclosures revealing false or misleading statements (one on January 20, 2015, one on January 28, 2015, and one on July 22, 2015), Defendants only challenge the July 22, 2015 disclosure. *See* MTD.

On July 22, 2015, Qualcomm issued a press release announcing that Qualcomm again reduced its guidance for "semiconductor business, QCT, in the fiscal fourth quarter compared to our prior expectations driven primarily by factors impacting premium-tier demand, including: increased concentration within the premium-tier causing reduced demand for certain OEM devices that include our chipset; lower demand for our premium-tier chipsets from a vertical customer; and lower sell through in China of certain handset models using our premium-tier chipsets." SAC ¶ 285. Qualcomm attributed the reduction of QCT guidance in substantial part to the 810's issues and resulting lack of OEM phone sales, and the impact of losing Samsung's flagship Galaxy S6 business (which was publicly announced in March). SAC ¶ 286. Defendant Mollenkopf explained that Apple and Samsung together have more than 85% share of premium-tier shipments and OEMs are now pursuing vertically integrated strategies at increased levels. SAC ¶ 287. As such, these adversely impacted QCT's guidance. *See id.* Plaintiff alleges that Defendants still concealed the risk that devices using the 810, like the LG G Flex 2, Xiaomi Mi Note Pro, HTC One M9, and Xperia's Z3+ and Z4, would also overheat and perform poorly, resulting in fewer sales of those devices. SAC ¶ 288. Defendants' press release also still allegedly concealed the risk that OEMs selling devices with the 810, like LG, Xiaomi, HTC, and Sony, would likely reduce their demand for additional 810's. *Id.* Finally, Plaintiff alleges that the delay of OEM launches of devices with the 810, such as Xiaomi Mi Note Pro and OnePlus 2, and decisions to use the 808 or 820 in the LG G4 and Xiaomi Mi 5 due to overheating issues, further reduced demand for and sales of the 810. *Id.* As a result of the press release, the price of Qualcomm common stock declined by $2.41 per share, or 3.75% from a close of $64.19 on July 22, 2015, to close at $61.78 per share on July 23, 2015. SAC ¶ 288.

15cv2678-MMA (WVG)

Analysts attributed the stock price decline to the ongoing performance and overheating issues with the 810, as well as the impact of the loss of Samsung.  SAC ¶ 289.

In dismissing the FAC, the Court found that Plaintiff failed to link economic losses to disclosure of the alleged fraud because the July 22, 2015 disclosure does not mention the 810's propensity to overheat and Defendants' statements are limited to comments that the 810 would be included in many devices.  Order at 31.  Defendants contend that the earnings release did not reveal the falsity of any prior statement and the Court should find that, like the FAC, the SAC does not establish loss causation.  MTD at 31.

As the Court found before, Defendants' mere reduction in outlook does not reveal a prior fraud.  "[O]ur precedent requires a securities fraud plaintiff to allege that the market 'learned of and reacted to a *fraud*, as opposed to merely reacting to reports of the defendant's poor financial health generally."  *Loos*, 762 F.3d at 887-88 (quoting *Metzler Inv.*, 540 F.3d at 1063 (9th Cir. 2008)) (emphasis added) (internal alterations omitted).  Plaintiff still fails to link economic losses to disclosure of the alleged fraud because Plaintiff still does not allege that Defendants made false or misleading statements regarding how well devices which included the 810 would sell.  *See* Order at 31.  Notably, the third disclosure does not mention the 810's propensity to overheat.  Rather, the SAC, just like the FAC, alleges that Defendants statements were limited to comments that the 810 would be included in many devices and that the 810 had a propensity to overheat.  Plaintiff's argument that the July 22, 2015 conference call reveals the concealed fraud even though it does not precisely disclose the parameters of the fraud is insufficient.  *See* Oppo. at 41.  The statements from the conference call were considered by the Court in its prior order dismissing the FAC and the statements are substantively the same in the SAC.  As a result, any argument that the conference call now supports Plaintiff's loss causation allegations is insufficient.  Plaintiff did not link economic losses to disclosure of the alleged fraud because the July 22 disclosure does not reference the 810's propensity to overheat.  As a result, the Court finds that Plaintiff has not sufficiently alleged loss causation as it relates to Qualcomm's July 22, 2015 statement.

*C.* *Whether Plaintiff Adequately Pleads Material Misrepresentations or Omissions*

To state a claim for securities fraud, a plaintiff must allege a material misrepresentation or omission. *In re Daou Sys. Inc.*, 411 F.3d at 1014. A misrepresentation or omitted fact is material if there is a substantial likelihood that the misstatement or omitted fact "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *See Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *see also In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1021 (S.D. Cal. 2005). To plead falsity with the requisite particularity, "a securities fraud complaint must . . . specify each statement alleged to have been [false or] misleading, the reason or reasons why the statement is [false or] misleading, and, if an allegation regarding the statement or omission is made on information or belief, . . . all facts on which that belief is formed." *Zucco*, 552 F.3d at 990-91 (internal quotation marks omitted). "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet this standard." *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).

Further, "Rule 10b-5 and Section 14(e) in terms prohibit *only* misleading and untrue statements, not statements that are incomplete." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (emphasis in original). In other words, section "10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). "Disclosure is required under these provisions only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading." *Id.* (quoting 17 C.F.R. § 240.10b-5). An omission is misleading where it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody*, 280 F.3d at 1006 (citing *McCormick v. The Fund American Cos.*, 26 F.3d 869, 880 (9th Cir. 1994)). "Even with respect to

information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market." *Matrixx*, 563 U.S. at 45.

Plaintiff alleges Defendants made a series of misleading statements because, at the time these statements were made, Defendants knew that Samsung had elected not to use the 810 due to its overheating issues and Defendants knew of the 810's propensity to overheat. In light of the Court's finding that the July 22, 2015 corrective disclosure is insufficiently pleaded, the Court only addresses the alleged falsity of statements made on or before January 28, 2015. The Court addresses these statements in three separate categories: (1) misleading statements regarding OEM acceptance of the 810 from November to December 2, 2014; (2) misleading statements that denied rumors of overheating in the 810 from December 4, 2014 to January 7, 2015; and (3) false and misleading statements or omissions regarding performance of the 810 on January 28, 2015. SAC ¶ 213-66.

To determine whether Plaintiff has sufficiently alleged actionable statements, the Court must consider the timing and circumstances under which each statement was made. *See Bruce v. Suntech Power Holdings Co. Ltd.*, 64 F. Supp. 3d 1365, 1375 (N.D. Cal. 2014) (stating that a complaint must allege the subject "statements were false *when made*"). For that reason, the Court addresses the statements at issue chronologically.

      1.    *Misleading Statements Regarding OEM Acceptance from November to December 2, 2014*

Plaintiff alleges Defendants made several misleading statements in November and December 2014 with respect to OEM acceptance of the 810 in their flagship devices. SAC ¶¶ 216-17. For example, on November 19, 2014, Defendant Amon stated the following at an Analyst Meeting in New York:

> Snapdragon traction, I think we talk about that every year and it's a ***very important metric*** for us. I think [I'll] start with the premium-tier. Snapdragon processors continue to set the design point for the premium-tier ***has been*** [sic] ***a number of flagship devices across many of the OEMs***. I won't list them

all, but I think it's very clear that we'll be able to maintain our leadership position in the premium-tier.

SAC ¶ 216 (emphasis in original). Additionally, on December 2, 2014, Qualcomm posted an article called "Get to know the Snapdragon 810 processor" on its corporate website. SAC ¶ 217. The article stated that "*[m]any of the flagship smartphones released next year are expected to be built around Qualcomm® Snapdragon™ 810 processors* which means they'll include a variety of features designed to give you the most cutting-edge experience possible." SAC ¶ 217 (emphasis in original). Plaintiff alleges that both of these statements "effectively" confirmed that Samsung would use the 810 in the Galaxy S6, when in fact, Defendants knew that Samsung would not use the 810 because it suffered from severe overheating issues. *See* SAC ¶¶ 215-220; *see also* Oppo. at 18.

The Court addressed both of these statements in its order dismissing Plaintiff's FAC and found neither to be actionable. Order at 17-18. Specifically, the Court found that the majority of these statements "are statements of belief or unspecific statements of puffery." *Id.* at 18. The Court further found that Plaintiff failed to allege how the 810's overheating issues rendered false or misleading Defendants' vague statements regarding the features and design of the 810, or assertions regarding its future inclusion in commercial devices. *Id.* at 19. The Court found the fact that the 810 was still being tested and developed to be of particular relevance. *Id.* Additionally, the Court found that Plaintiff failed "to sufficiently plead Defendant Amon's assertion that the 810 would be included in many flagship devices was false or misleading based on the alleged fact that, by [late] 2014, Samsung had decided not to use the 810 in its flagship device." *Id.*

Plaintiff argues that statements showing a "strong demand" for products are actionable where a large customer was set to "discontinue all further orders of [the company's] popular product." Oppo. at 18 (citing *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1181-82 (S.D. Cal. 2009)). In *Backe*, the plaintiff alleged that the defendants' statements that there was strong demand for Novatel's products were false or

misleading because one of Novatel's biggest customers, Sprint, had already told Novatel they would "discontinue all further orders of the Company's popular" product. *Backe*, 642 F. Supp. 2d at 1181. There, Sprint accounted for 38.2% of Novatel's revenue. *Id.* at 1174. Here, Samsung amounts for roughly 12% of Qualcomm's revenue and decided not to use the 810 in the Galaxy S6. SAC ¶¶ 209, 337-38. Further, the SAC alleges that Qualcomm personnel and Defendant Renduchintala were aware that Samsung was "planning" on abandoning the 810 in late 2014, but does not allege when Samsung finalized its decision—indicating that Defendants plausibly did not know Samsung had in fact abandoned the 810 during this time period. SAC ¶¶ 109-10. Also, as Defendants note, *Backe* deals with cancelled orders, whereas here Qualcomm simply did not win Samsung's design. Reply at 10. Accordingly, the Court finds *Backe* distinguishable from the facts present in the instant case.

Further, these statements neither falsely indicated that Samsung would use the 810 in the Galaxy S6 nor affirmatively misled Plaintiff. Defendants assert that the alleged actionable statements do not "point out any *false statement by Defendants*: rather, all these allegations point to *false deducements made by Plaintiffs* and/or by the journalists and analysts upon those whose opinions Plaintiff[] elected to rely." *In re Synchronoss Secs. Litig.*, 705 F. Supp. 2d 367, 406 (D.N.J. 2010); *see In re OmniVision Techs., Inc. Sec. Litig.*, 937 F. Supp. 2d 1090, 1099 (N.D. Cal. 2013). Plaintiff fails to sufficiently plead that Defendant Amon's assertion that "a number of flagship devices across many of the OEMs" would use the 810 processor which would permit Qualcomm to "maintain [its] leadership position in the premium tier," and Qualcomm's statement that "[m]any of the flagship smartphones released next year are expected to be built around" the 810, were false or misleading based on the alleged fact that, by November 2014, Samsung had informed Qualcomm it was "planning" not to use the 810 in the Galaxy S6 because of overheating issues. Like the FAC, the SAC still does not allege facts that would render Defendants' arguably incomplete statements misleading or false. Plaintiff does not contend that many OEMs planned on not using the 810. In fact, the SAC alleges that

many OEMs, including LG, HTC, ZTE, Xiaomi, and Sony, did use the 810 in its flagship devices. SAC ¶¶ 141-97.

Plaintiff also argues that these statements are actionable because at the time they were made the public believed Samsung would use the 810. Specifically, Plaintiff refers to several news outlets, including an April 2014 *Tech 2* article, a May 2014 *Motley Fool* article, an October 2014 *International Business Times* article, and an October 2014 *Gadgets 360* article, which reported that Samsung was expected to use the 810 in its Galaxy S6. SAC ¶¶ 213-14. Additionally, Plaintiff refers to a December 3, 2014 report—released after Defendants' statements—by analysts at Canaccord, which opined that they "anticipate" Samsung will use the 810. SAC ¶ 218. Thus, Plaintiff appears to argue that "analysts' interpretation of a statement can reveal [a statement's] tendency to mislead." *In re OmniVision Techs., Inc. Sec. Litig.*, 937 F. Supp. 2d at 1102. However, Defendants' alleged statements are consistent with both Plaintiff's deduction that Samsung would use the 810 in its next flagship device and with the opposite conclusion that Qualcomm had lost its position with Samsung, but continued to do well with other OEMs. As indicated by Defendants, the statements themselves did not affirmatively lead the market to one conclusion or the other. Reply at 10. The mere fact that Defendants' statements did not disabuse Plaintiff, analysts, or journalists of their conclusion that Qualcomm's 810 would be used in Samsung's Galaxy S6 does not render the statements actionable. *See id.* at 1102.

In conclusion, Plaintiff fails to sufficiently plead Defendants' statements on November 19, 2014 and December 2, 2014 were materially false or misleading.

2.    *Misleading Statements that Denied Rumors of Overheating from December 4, 2014 to January 7, 2015*

After December 4, 2014, Plaintiff alleges the circumstances surrounding some of Qualcomm's statements changed. According to the SAC, on December 4, 2014, *Business Korea* published an article, "Unexpected Hurdle: Problems in Qualcomm Snapdragon Set Alarm Bells Ringing for Samsung, LG." SAC ¶ 221. The article reported that "[t]he

Snapdragon overheats when it reaches a specific voltage," and thus it was "unclear if the Snapdragon 810 will be used in premium smartphones like the Galaxy S6, the G4, and the Xperia Z4." *Id.*  Plaintiff alleges that, on December 8, 2014, *TechRadar* published an article entitled, "Galaxy S6 and LG G4 facing delays thanks to Snapdragon 810 defects?" SAC ¶ 222.  That article included the following statement from Qualcomm: "We won't comment on any of the rumor or speculation you referenced, but I can tell you that ***everything with Snapdragon 810 remains on track*** and we expect commercial devices to be available in 1H 2015." *Id.* (emphasis in original).  Additionally, on December 8, 2014, *Gadgets 360* reported that Jon Carvill, Senior Director of Public Relations at Qualcomm "cleared the air by ***stating that everything is on track***." SAC ¶ 223.  While "Carvill refused to give his take on the several speculations," he did say "***I can tell you that everything with the Snapdragon 810 remains on track and we expect commercial devices to be available in 1H 2015.***" *Id.*  According to the SAC, *Tom's Hardware* posted a similar article that same day stating "***Qualcomm has denied that any of these [Business Korea] rumors are true*** in a short but clear statement to *Tom's Hardware*: '***Snapdragon 810 remains on track and we expect commercial devices to be available in 1H 2015***.'"  SAC ¶ 224 (emphasis in original).

On January 5, 2015, Defendant Aberle responded to a question regarding the 810's functionality problems at a CES press conference.  SAC ¶ 225.  He explained, "***[w]e're on track with the 810***." *Id.* (emphasis in original).  Two days later, on January 7, 2015, *Tom's Hardware* updated an earlier article to include a statement from Tim Leland, Qualcomm's Vice President of Product Management.  SAC ¶ 226.  He stated that "while there are always engineering challenges to overcome when bringing new technology to the market, ***there aren't any significant technical issues that will cause delay***." SAC ¶ 226 (emphasis in original).

Plaintiff alleges that these statements were misleading because Samsung had already rejected the 810 for use in the Galaxy S6, and testing in 2014 revealed excessive overheating in the 810 such that it was released in a defective state.  SAC ¶¶ 227-29.

Defendants argue these statements are not actionable because they are forward looking, "on track" statements containing vague expressions of optimism, and are therefore not false.  Also Plaintiff does not allege facts supporting the premise that Samsung used its own chip because the 810 was overheating.  MTD at 19-20.  Plaintiff opposes Defendants' argument, citing to several cases which upheld "similar misstatements."  The Court will discuss Defendants' arguments in four different categories: (i) statements that the 810 remains on track and commercial devices are to be available in 1H 2015; (ii) statements that *Business Korea's* report of the 810 overheating are "rumor or speculation;" (iii) Qualcomm's statement that "there aren't any significant technical issues that will cause delay;" and (iv) Plaintiff's factual allegations supporting the premise that Samsung used its own chip because the 810 was overheating.

> ### i.    On Track Statements

First, the Court addresses Defendants' argument that their statements that the 810 remains "on track" and is expected to be commercially available in 1H 2015 are forward-looking, and therefore not actionable under the PSLRA.  MTD at 19; Reply at 11.  "The PSLRA imposes additional burdens [upon] allegations involving predictions." *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 254 (3d Cir. 2009).  The PSLRA's safe harbor provision exempts statements regarding "plans and objectives of management for future operations," including products and services, if they are identified as forward-looking and accompanied by meaningful cautionary language or if plaintiff does not allege facts creating a strong inference of scienter.  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014).  Here, three of the statements between December 2014 and January 7, 2015, contain cautionary language.  Specifically, on December 8, 2014, Qualcomm stated that the 810 remains on track and "we *expect* commercial devices to be available in 1H 2015."  SAC ¶¶ 222, 223.  The fact that these three statements contain cautionary language and are forward-looking exempts them from being actionable.  *See Guangyi Xu v. ChinaCache Int'l Holdings, Ltd.*, No. CV15-07952-CAS (RAOx), 2017 WL 114401, at *6-7 (C.D. Cal. Jan. 9, 2017) (finding

defendants "on track" statements exempted by the PSLRA safe harbor provision where they contained cautionary language that the defendants "expected" to be fully functional by the end of the first quarter); *see also Institutional Inv'rs Grp*, 564 F.3d at 256-58 (finding defendant's "on track" statement exempted by the PSLRA safe harbor provision where defendant qualified that the projection "may turn out to be wrong"). As a result, all three of the December 8, 2014 statements that the 810 remains on track and Qualcomm expects commercial devices to be available in 1H 2015 are not actionable.

Assuming, arguendo, that the three statements above are not exempted by the safe harbor provision, all "on track" statements are still not actionable. As noted, a claim under § 10(b) requires a false or misleading statement or omission of material fact. *See Paracor Fin., Inc. v. General Electric Capital Corp.*, 96 F.3d 1151, 1157 (9th Cir. 1996). "No matter how untrue a statement may be, it is not actionable if it is not the type of statement that would significantly alter the total mix of information available to investors. *See In re Apple Computer*, 243 F. Supp. 2d 1012, 1025 (N.D. Cal. 2002); *see also Basic*, 485 U.S. at 231-32 (1988) (holding with respect to omissions, to fulfill the materiality requirement under § 10(b), "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available") (internal citation omitted). "Numerous cases have held that general statements of optimism and 'puffing' about a company or product are not actionable." *In re Foundry Networks, Inc. Sec. Litig.*, No. C 00-4823 MMC, 2003 WL 22077729, at *15 (N.D. Cal. Aug. 29, 2003); *see also Parnes v. Gateway*, 122 F.3d 539, 547 (8th Cir. 1997) ("Soft, puffing statements generally lack materiality because the market price of a share is not inflated by vague statements predicting growth. No reasonable investor would rely on these statements, and they are certainly not specific enough to perpetuate a fraud on the market.") (internal quotation omitted); *Howard Gunty Profit Sharing v. Quantum Corp.*, No. 96 20711 SW, 1997 WL 514993, at *4 (N.D. Cal, 1997) ("vague or amorphous statements cannot serve as a basis for liability") (quoting *Raab v. General Physics Corp.*, 4 F.3d 286, 288-90 (4th

Cir. 1993)).  Several cases have held that statements that a company was "on track" are not actionable.  *See Hillson Partners Ltd. Partnership v. Adage, Inc.*, 42 F.3d 204, 214-16 (4th Cir. 1994) (holding that a company's statements that the company was "on track to exceed 1990, [its] record year for net income" and "on track toward reaching [the] previously forecast goal of record full-year profits," were not actionable because they were not "specific dollar predictions"); *Allison v. Brooktree Corp.*, 999 F. Supp. 1342, 1348 (S.D. Cal. 1998) (holding that a company's statements that "I think we're on track" and "the BtV chipset was on track to ship in July/August," to be not actionable, "vague statements of optimism"); *Copperstone v. TCSI Corp.*, No. C 97-3495 SBA, 1999 WL 33295869, at *8 n.5 (N.D. Cal. Jan. 19, 1999) (holding a company's statement that the "business was on track," was not actionable, because "reasonable investors do not consider 'soft' statements or loose predictions important in making investment decisions"); *In re Foundry Networks, Inc. Sec. Litig.*, 2003 WL 22077729, at *16 (N.D. Cal. Aug. 29, 2003) ("the statement that business 'remains on track' is not sufficient to support a claim under § 10(b)").

Moreover, Plaintiff has not established that the 810's prospects to be commercially available in 1H 2015 were impracticable or impossible to meet.  In fact, Plaintiff alleges that LG, HTC, ZTE, Xiaomi, and Sony released devices with the 810 in the first half of 2015 and that most OEMs decided not to delay the release of their product.  SAC ¶¶ 140-43, 145-46, 161-62, 164, 173-77.  Thus, Defendants' statements that the 810 was "on track" are not a material misrepresentation or omission.

### ii.     Rumor or Speculation Statements

Second, the Court addresses Defendants' referencing the content of *Business Korea's* report as "rumor or speculation."  Plaintiff contends that these statements cannot be considered immaterial puffery because they were issued in response to "analysts' specific concerns that the 810 was overheating and Samsung was defecting."  Oppo. at 30-31.  Rather, Plaintiff alleges that these statements are "affirmative denials of the

overheating rumors." SAC ¶ 229. Defendants contend that these statements do nothing more than "refuse[] to comment on the reports of overheating." Reply at 12.

In reviewing the context of Defendants' statements, the Court finds that they are not "affirmative denials" of the overheating rumors. Defendants explained that they wouldn't comment on the rumor or speculation. *See* SAC ¶ 222 ("we won't comment on any of the rumor or speculation"), ¶ 223 ("Carvill refused to give his take on the several speculations"); ¶ 224 (showing that the journalist from *Tom's Hardware* said Qualcomm's statement is a denial of the rumors, but the actual statement does not refer to the rumor). Plaintiff also fails to allege facts specifying that during late December 2014 and early January 2015 Defendants knew the overheating issues would delay release dates beyond 1H 2015 or that OEMs would not use the 810, negating the falsity of the statements. With respect to Samsung, Plaintiff alleges that in late January 2015, Qualcomm offered to modify the chip "in an effort to get Samsung to use it in their Galaxy S6." SAC ¶ 200. While the SAC clarifies that Qualcomm ultimately decided not to provide Samsung with the updated version, the SAC does not specify when Qualcomm made that decision. *See* SAC ¶ 204. Thus, referring to Samsung's decision to abandon the 810 as "rumor" or "speculation," may have indeed just been a rumor or speculation at the time these statements were made, as Qualcomm was still attempting to appease Samsung in an effort to convince it to use the 810 in the Galaxy S6. Further, the other devices listed in the *Business Korea* article did use the 810. Accordingly, statements referencing the contents of the article as "rumor" or "speculation" are not actionable. *See In re Caere Corporate Sec. Litig.*, 837 F. Supp. 1054, 1058 (N.D. Cal. 1993) (statements which are "essentially . . . 'no comment' statement[s], [are] not actionable under most circumstances") (citing *Basic*, 485 U.S. at 238 n.17).

### iii. Technical Issues Causing Delay

Third, the Court addresses Defendant's statement that there aren't any "significant technical issues that will cause delay." Plaintiff has not sufficiently pleaded that Qualcomm's statement that "while there are always engineering challenges to overcome

35

when bringing new technology to the market, there aren't any significant technical issues that will cause delay" was materially false or misleading.  SAC ¶ 226 (emphasis omitted).  In dismissing the FAC, the Court found that Plaintiff did not sufficiently allege that there were any delays with the 810, and that accordingly, Plaintiff failed to allege that Defendant's reassurances regarding potential delays were false or misleading.  Order at 22.  Plaintiff's SAC now alleges there were delays with OEM release dates due to the 810.  *See* SAC.  Specifically, Plaintiff alleges that Xiaomi released the Mi Note Pro two months after the originally planned release date and OnePlus delayed the release of the OnePlus 2 by seven months.  SAC ¶¶ 164-65, 194.  The media reported that these delays were due to OEMs attempting to resolve overheating issues with the 810.  SAC ¶ 165, 194-97.  However, "in order to allege that Defendants knew their statements were false, Plaintiff[] must allege that Defendants knew the difficulties [regarding the 810] were insurmountable or particularly significant.  Knowledge that there were some obstacles to development . . . is not sufficient . . . ."  *In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d 871, 884 (D. Minn. 2007), *aff'd*, 527 F.3d 749 (8th Cir. 2008).  Defendants are correct in that Plaintiff has not alleged that the release date of the 810 was impossible nor that the 810 itself was delayed.  *See* MTD at 19.  The SAC, in fact, shows that several OEMs did release mobile devices containing the 810 during 1H 2015.  As such, this statement referencing technical issues causing a delay is not actionable, notwithstanding that two OEMs ultimately did delay their release dates.

### iv.    Basis for Samsung's Decision

Fourth, The Court addresses Defendants' argument that Plaintiff fails to sufficiently plead that Samsung rejected the 810 because of its overheating issues.  MTD at 19-21.  In dismissing the FAC, the Court found that Plaintiff had not "allege[d] with particularity that Samsung's reason for abandoning the 810 was based on the chip overheating."  Order at 22.  The Court specified that "Plaintiff's sole allegations regarding Samsung's reason for its decision not to use the 810 are undetailed and based entirely on a confidential witness and other unidentified sources."  *Id.*  Plaintiff provides

four reasons why the SAC sufficiently ties Samsung's rejection of the 810 to its overheating issues: (a) the SAC cites firsthand accounts by former Qualcomm employees that Samsung rejected the 810 because of its overheating; (b) the SAC cites media sources confirming Samsung's rejection of the 810 due to overheating during testing; (c) news publications in early 2015 reported that Qualcomm offered Samsung a newer version of the 810 in an attempt to retain Samsung's business; and (d) Samsung had used the Snapdragon chip in every Galaxy device since 2011, rejected the 810 for the S6, and then used the 820 in the Galaxy S7.  Oppo. at 22-23.

### a.    *Confidential Witnesses*

The SAC alleges that in August 2014, CW 2 noted that Qualcomm was aware that Samsung encountered thermal issues with the 810 and that Samsung might use its own chip for its flagship device.  SAC ¶ 108.  The SAC clarifies that CW1 "specifically recalled that colleagues and co-workers represented during lunch meetings that Samsung was dropping the Snapdragon 810 because of these overheating issues."  SAC ¶ 108.  CW2, a former Qualcomm Senior Staff Engineer who interacted regularly with Samsung to coordinate the launch of the 810, met weekly with a Samsung counterpart who disclosed in October 2014 that Samsung planned to abandon the 810 because of its thermal issues.  SAC ¶¶ 40, 109.  The SAC alleges that Defendant Renduchintala was aware of Samsung's decision within one or two weeks of CW2 meeting with the Samsung counterpart.  SAC ¶ 110.  CW6 confirmed that Samsung raised issues specific to the 810's overheating during testing of the chip and deliberation over whether to use the 810 in the Galaxy S6.  SAC ¶ 111.  Members of CW6's team aided in discussions and negotiations between Qualcomm and Samsung regarding whether to use the 810 in the Galaxy S6 up until Samsung informed Qualcomm it would not use the 810.  *Id.*  Team members "informed" CW6 that Samsung raised the 810's overheating issues during these discussions and negotiations.  *Id.*  CW8 also learned that Samsung abandoned the 810 due to thermal and power consumption issues from Qualcomm engineers.  SAC ¶ 112.  Defendants challenge the reliability of CW6 and CW8.  MTD at 19-20.

To meet the PSLRA's standard of particularity for personal sources of information, the Ninth Circuit applies the standard that "personal sources of information relied upon in a complaint should be 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *In re Daou Sys. Inc.*, 411 F.3d at 1015 (quoting *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1233 (9th Cir. 2004)). Plaintiff "need not name their sources as long as [other facts] provide an adequate basis for believing that the defendants' statements were false." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000); *see also In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999) (explaining that the complaint should include "adequate corroborating details"). Pursuant to *Daou*, a plaintiff sufficiently meets the PSLRA requirements for confidential witnesses by (1) "describ[ing] [their] job description and responsibilities"; (2) "provid[ing] the witnesses' exact title"; and (3) identifying "to which . . . executive the witness reported." *In re Daou Sys. Inc.*, 411 F.3d at 1016.

Plaintiff describes CW6 and CW8 by providing their job titles, employment dates, job responsibilities, specific reports drafted and/or received or meetings attended, and direct interaction with Defendants. SAC ¶¶ 44, 46. As a result, CW6 and CW8 satisfy *Daou's* minimum reliability standards. However, that "doesn't mean that *every* statement offered by these witnesses must be accepted as true." *Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1073 (C.D. Cal. 2012). Defendants contend that the statements attributed to CW6 and CW8 are undetailed and vague hearsay. MTD at 20. For example, Defendants state that according to CW6's unidentified team members, Samsung specifically raised the overheating issues with Qualcomm, but fails to explain who raised these issues, when these discussions occurred, what was said, or whether these issues had any bearing on Samsung's decision not to use the 810. *Id.* Defendants similarly question CW8's statements because he did not work on the 810 and supposedly learned Samsung would not use the 810 because of overheating from unnamed Qualcomm engineers. *Id.* Confidential witnesses' hearsay statements are not automatically precluded, but they

"may indicate that a confidential witnesses' report is not sufficiently reliable, plausible, or coherent to warrant further consideration . . . ." *Zucco Partners, LLC*, 552 F.3d at 998 n.4. Both CW6's and CW8's statements and confirmations that Samsung abandoned the 810 because of its overheating are based on hearsay (someone at Samsung told some workers at Qualcomm who then told CW6 and CW8 that Samsung was abandoning the 810 because of its overheating issues). These hearsay statements on their own are insufficient to pass muster under *Daou*. *Id.* at 997. However, as will be discussed below, the Court finds that Plaintiff has provided adequate corroborating detail through other sources.

> b.    *Media Sources*

Plaintiff asserts that the following media sources support its allegation that Samsung decided against the 810 because of its propensity to overheat.[9]  On January 20, 2015, *Bloomberg's* article "Samsung Said to Drop Qualcomm Chip From Next Galaxy S" reported that Samsung would use its own SoC because the 810 "overheated during . . . testing." SAC ¶129, 272. On February 23, 2016, *The Los Angeles Times* reported that Samsung's Galaxy S7 would use the 820. SAC ¶ 209. On June 15, 2015, *Talk Android* reported a correlation between the 810's overheating and a likely reduction in 810 sales and noted that Samsung skipped the Snapdragon line for its own chip in the Galaxy S6. SAC ¶ 290. In the FAC, Plaintiff only referenced the January 20, 2015 *Bloomberg* article. *See* FAC. Thus, Plaintiff contends that the SAC now supports its allegations with two additional articles. SAC ¶¶ 129, 209, 272, 290. However, *The Los Angeles Times* article may not be used to prove Defendants' statements were actionable because it was published well after Defendants' alleged misstatements in January of 2015. *See Bruce*,

---

[9] Some of Plaintiff's media sources cited in the opposition do not refer to Samsung, and as a result, are not discussed here. For example, Plaintiff cites to SAC ¶ 165, which refers to a *Gizmo China* report relating to Xiaomi's overheating problems. Additionally, some of Plaintiff's media sources do not report that Samsung encountered overheating with the 810 during testing and those articles will likewise be omitted from this analysis.

39

64 F. Supp. 3d at 1375 (stating that a complaint must allege the subject "statements were false *when made*"). Further, the *Talk Android* article is disregarded because it does not report that Samsung encountered overheating during testing of the 810; it merely states that there might be a correlation between the 810's overheating and a reduction in 810 sales. SAC ¶ 290. As a result, Plaintiff has not bolstered its factual allegations that several media sources reported that Samsung encountered the 810's overheating issues during testing.

       *c.*     *News Publications Regarding an Updated Version of the 810*

Plaintiff's third reason asserts that several news publications reported that Qualcomm offered Samsung an updated version of the 810 to remedy overheating issues. The SAC alleges that on January 22, 2015, the *Wall Street Journal* reported that "Qualcomm offered a 'fix' to the 810's overheating issues in the form of a modified chip in an effort to get Samsung to use it in their Galaxy S6," which would be available in March 2015. SAC ¶ 200. Two days later, on January 24, 2015, *GSM Arena* confirmed the *Wall Street Journal's* report, stating that "Qualcomm is developing an updated version of the SoC for Samsung to use," and that this news "comes as a bit of an acknowledgment by Qualcomm of the chipset's issues, which the company has strenuously denied so far." SAC ¶ 201. On January 27, 2015, *Android Authority* reported that Qualcomm's modification of the 810 would effectively admit that the 810 overheats. SAC ¶202. On January 28, 2015, *Korea Times* reported that "Qualcomm plans to update the chip to fix these issues after Samsung Electronics decided to ditch the chip for its Galaxy S6 model." SAC ¶ 203. These reports make it plausible that Qualcomm offered a modified version of the 810 to address overheating, but on their own does not make it plausible that Samsung abandoned the 810 because of overheating.

       *d.*     *Samsung's Pattern of Using Snapdragon Chips*

Plaintiff's fourth and final reason asserts that Samsung's pattern of using a Snapdragon SoC in every Galaxy device since 2011, except for the S6, supports an inference that Samsung rejected the 810 due to its overheating issues. Oppo. at 23. On

its own, this fact would merely make it possible that the Samsung rejected the 810 because of overheating issues. However, in line with the additional facts alleged by Plaintiff, it is plausible that Samsung's decision not to use the 810 in the Galaxy S7 was related to the 810's overheating.

e.    It is Plausible that Samsung Decided Against the 810 Because of its Overheating Issues

As a result, Plaintiff's SAC no longer bases its contention that Samsung decided not to use the 810 due to the 810's overheating issues on undetailed allegations based on a confidential witness and unidentified sources. Plaintiff now supports the allegation with several confidential witnesses, media sources' reports, and Samsung's pattern of using Snapdragon SoCs. While each of these reasons on its own might be insufficient to support the allegation that Samsung decided not to use the 810 because of its overheating issues, the facts alleged corroborate one another and make it plausible that Samsung found overheating in the 810 to be dispositive.

However, statements that the 810 is "on track" and commercial devices with the 810 are expected to be available in 1H 2015 are not a material misrepresentation or omission regardless of the reason behind Samsung's decision. The statements between December 4, 2014 and January 7, 2015 could lead one to opine that Samsung is expected to use the 810, but could also mean that the 810 will not be used by Samsung but that the 810 remains on track with other OEMs. The statements themselves did not affirmatively lead the market to one conclusion or the other, and thus they are not actionable. *In re OmniVision Techs., Inc. Sec. Litig.*, 937 F. Supp. 2d at 1102. Further, Plaintiff does not allege when Samsung's decision became final, and only alleges that during the timeframe of these statements Samsung had informed Qualcomm it "planned" to abandon the 810.

v.    Conclusion

In summation, Defendants' statements that the 810 was "on track," that it was expected to be available in 1H 2015, and that there aren't any significant technical issues that will cause a delay, are not material misrepresentations or omissions because Plaintiff

41

failed to allege that Defendants' knew the expected release date was "insurmountable or particularly significant." *See In re NVE Corp. Secs. Litig.*, 551 F. Supp. 2d at 884. The fact that several OEMs were ultimately commercially available in 1H 2015 undercuts Plaintiff's argument.

   3.   *False and Misleading Statements or Omissions Regarding Performance on January 28, 2015*

On January 28, 2015, Defendants Mollenkopf and Qualcomm made two statements, explaining that the 810 was "performing well," or "as expected," and that any concerns are related to "one OEM." SAC ¶¶ 232-33. Plaintiff has pleaded with sufficient particularity that on January 28, 2015, there were problems with the 810 not limited to one OEM and that it was not "performing well." Defendants contend that Plaintiff insufficiently pleads falsity of these statements based on problems during development of the 810, reports of overheating by consumers and supposed benchmark tests, a possible product update, the acceleration of a successor chip, and statements and actions of certain OEMs. MTD at 21. Specifically, Defendants argue that none of Plaintiff's allegations support Plaintiff's theory that production of the 810 suffered debilitating thermal issues or was fundamentally compromised, and therefore Defendants' statements could not have been materially false or misleading when made. *Id.* Defendants also argue that these are statements of opinion. Reply at 9. The Court finds that none of these arguments warrant dismissal of Defendants Mollenkopf or Qualcomm with respect to the January 28, 2015 statements at this stage of the proceedings.

Specifically, within the timeframe of these statements, Plaintiff alleges that immediately following LG's release of the G Flex 2 on January 5, 2015, CW2 and CW3 recall consumers complained their smartphones were operating slowly and resetting because of the 810. SAC ¶ 142. Indeed, on January 22, 2015, before Defendants' statements, the *Wall Street Journal* published an article reporting that LG was "working around 'the chip's heat emission.'" SAC ¶ 143. Further, CW5 reports that Customer

Support Engineers at Qualcomm and Sony worked closely together to resolve overheating issues with the 810 in January 2015. SAC ¶ 171. OnePlus was also supposed to launch the OnePlus 2 on January 28, 2015, but delayed the launch due to overheating issues. SAC ¶ 194. On January 23, 2015, *Forbes* reported that the launch was "forced back . . . because of 'manufacturing challenges with the . . . 810,'" related to the same overheating issues that reportedly caused Samsung to reject the 810 for its Galaxy S6. *Id.* Thus, Plaintiff has sufficiently pleaded a material misrepresentation or omission as to statements made on January 28, 2015. *See Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1029 (N.D. Cal. 2016) (finding that the plaintiff sufficiently pleaded facts demonstrating falsity by alleging customer complaints, studies, and confidential witness statements).

### C. *Whether Plaintiff Adequately Pleads Scienter*

To plead scienter in accordance with the PSLRA, a plaintiff must "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind' with respect to each act or omission." *In re Apple Computer, Inc.*, 127 Fed. App'x 296, 299 (9th Cir. 2005) (quoting 15 U.S.C. § 78u-4(b)(2)). To act with the required state of mind means to make false or misleading statements "either intentionally or with deliberate recklessness." *Reese*, 747 F.3d at 569 (emphasis omitted). "Deliberate recklessness means that the reckless conduct 'reflects some degree of intentional or conscious misconduct.'" *Id.* (quoting *S. Ferry LP, No.2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008)). A defendant acts with deliberate recklessness where he has "reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Id.* (quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010)). To plead a strong inference of deliberate recklessness, a plaintiff must allege "a highly unreasonable omission, involving not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the

defendant or is so obvious that the actor must have been aware of it." *See Zucco*, 552 F.3d at 991 (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 976 (9th Cir. 1999) *as amended* (Aug. 4, 1999)). "[F]acts showing mere recklessness or a motive to commit fraud and opportunity to do so" are insufficient to plead a strong inference of deliberate recklessness. *Id.* In determining whether a plaintiff has alleged facts giving rise to a strong inference of scienter, "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 323-24. The inference of scienter need not be the most plausible inference, but it must be "strong in light of other explanations." *Id.* at 324. In sum, a complaint sufficiently alleges scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* The Court may consider "whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter," but, if none suffice, must "conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *See Zucco*, 552 F.3d at 992; *Tellabs,* 551 U.S. at 323-24; *Matrixx*, 563 U.S. at 48; *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 703 (9th Cir. 2012).

In light of the Court's finding on loss causation and falsity, the Court only determines scienter with respect to the makers of the January 28, 2015 statements— Defendants Mollenkopf and Qualcomm. Here, Plaintiff must prove adequate scienter as to Defendant Mollenkopf before imputing it to Qualcomm. *See In re Maxwell Techs., Inc. Sec. Litig.*, 18 F. Supp. 3d at 1032; *In re Apple Computer, Inc.*, 127 Fed. App'x at 303 (holding that "a corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter at the time he or she makes the statement"). As a corporation, Qualcomm can only act by and through its agents and employees. District courts in the Ninth Circuit have found it proper to impute the scienter of individual corporate officers to a corporation. *See In re*

*Hienergy Techs., Inc. Sec. Litig.*, No. SACV04-1226DOC(JTLX), 2005 WL 3071250, at *8 (C.D. Cal. Oct. 24, 2005) (citing *In re CV Therepeutics Sec. Litig.*, No. 03-03709 SI, 2004 U.S. WL 1753251, at *10 (N.D. Cal. Aug. 5, 2004); *In re Apple Computer, Inc.*, 243 F. Supp. 2d at 1023; *In re Ramp Networks, Inc. Sec. Litig.*, 201 F. Supp. 2d 1051, 1080 (N.D. Cal. 2002)). Defendants argue that Plaintiff fails to plead facts giving rise to a strong inference of scienter because Defendant Mollenkopf had no motive to lie and the SAC contains no particularized facts showing that Defendant Mollenkopf believed the 810 was defective.

Defendants first argue that the SAC does not point to a single suspicious stock sale by Defendant Mollenkopf, which makes it more plausible that there was no insider information to benefit from. MTD at 27-28. "[W]hile allegations of insider sales 'are not required' in securities fraud cases, *see In re Wells Fargo Secs. Litig.*, 12 F.3d 922, 931 (9th Cir. 1993); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1424-25 (9th Cir. 1994), the lack of *any* tangible, personal benefit here further weighs against [the Individual Defendants] having scienter." *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1177-78 (C.D. Cal. 2007). Defendants are correct that the SAC does not specify any suspicious stock sale by Defendant Mollenkopf, or any of the individual defendants named in the matter. As such, the Court considers this as a factor weighing against Plaintiff's allegations of scienter.

Second, Defendants argue that the SAC contains no particularized facts showing that Defendant Mollenkopf believed the 810 was defective. MTD at 29. Specifically, Defendants argue that it is more plausible that Defendant Mollenkopf did not believe there was a thermal defect. *Id.* Plaintiff counters that Defendant Mollenkopf had direct knowledge of the 810's overheating issues through contemporaneous reports or data and through attendance of meetings, and there is a strong inference of scienter based on the core operations theory. Oppo. at 34-39.

"The most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or

data, available to the party, which contradict the statement." *Nursing Home Pension Fund, Local 144*, 380 F.3d at 1230. Complaints which rely on the existence of internal reports must contain "at least some specifics from those reports as well as such facts as may indicate their reliability." *In re Silicon Graphics*, 183 F.3d at 985. Here, Plaintiff alleges that Qualcomm maintained, generated and/or distributed the following internal reports demonstrating that the 810 was experiencing abnormal thermal issues between March 2014 and December 2014: (1) Daily Audit Logs; (2) Product Development Test Reports ("PDT Reports"); (3) Sub-System Reports; (4) Root Cause Analysis Reports; and (5) Thermal Engineering Test Reports. SAC ¶ 83. Plaintiff explains that, according to CW4, Qualcomm performed extensive software testing on the 810 on MTP devices. SAC ¶ 84. The results from these tests were maintained on a Daily Audit Log, which "provided insight into what was causing the 810 to fail . . . and were reviewed and used by engineers." SAC ¶85. CW4 confirmed that overheating was identified as the biggest root cause for the negative test results. *Id.* The data from the Daily Audit Logs was compiled into a PDT Report, which contained several key metrics relating to thermal testing. SAC ¶86. The PDT Reports were generated daily and after milestones were reached for software builds. *Id.* These PDT Reports "were often sent directly to Defendants Renduchintala and Amon . . . ." *Id.* CW2 reports that Sub-System Reports, which confirmed the 810's overheating issues, were generated daily. SAC ¶ 88. CW2 and CW4 confirmed that Root Cause Analysis Reports and Thermal Engineering Test Reports likewise reported the 810's thermal issues and were sent to Qualcomm management. *Id.*

The SAC alleges that Defendant Renduchintala received daily PDT Reports outlining the 810's thermal issues, attended several meetings and conference calls to discuss the 810's thermal issues, and received numerous emails regarding the testing results of the 810. SAC ¶¶ 92-95; 297-305. Plaintiff alleges that Defendant Renduchintala "would have kept [Defendant] Mollenkopf apprised of the thermal problems with the 810, and the Company's inability to resolve them" because Defendant

Renduchintala reports to Defendant Mollenkopf. SAC ¶ 309. As a result, Plaintiff has sufficiently pleaded a strong inference that Defendant Renduchintala reported the 810's overheating issues directly to Defendant Mollenkopf and that Defendant Mollenkopf had access to several reports outlining the overheating issues.

Additionally, Plaintiff has sufficiently alleged that it is plausible that the nature of the relevant fact here is of such prominence that it would be absurd to suggest that Defendant Mollenkopf, the CEO of Qualcomm, was unaware of it. Under the "core operations" theory, scienter may be inferred where the facts critical to a business' "core operations" or important transactions are known to key company officers. *See South Ferry LP No.2*, 542 F.3d at 784-85. Allegations suggesting a core operations inference will generally not support a strong inference of scienter, absent "additional detailed allegations about the defendants' actual exposure to information." *Id.* at 784. However, "such allegations may independently satisfy the PSLRA when they are particular and suggest that defendants had access to the disputed information." *Id.* at 786. The "core operations" inference allows even generalized allegations about a defendant's role to suffice "in rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that the management was without knowledge of the matter." *Id.* (citing *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 (9th Cir. 2008)). Here, Samsung accounted for 10% of Qualcomm's revenues from 2011-2013 and the 810 was the focus of media scrutiny at the time. Further, the 810 was supposed to be QCT's "Cadillac" processor and Plaintiff alleges that Defendant Renduchintala "would have" reported all information relevant to issues with the 810 to Defendant Mollenkopf—suggesting that Defendant Mollenkopf had access to the disputed information. Accepting those factual allegations as true, which the Court must for the purpose of this motion, it could arguably be "absurd" to suggest that Defendant Mollenkopf was not aware of issues relating to the 810's overheating. *See Roberti*, 2015 WL 1985562, at *12-13 (C.D. Cal. Feb. 27, 2015); *see also Nursing Home Pension Fund, Local 144*, 380 F.3d at 1230.

Accordingly, the pleadings support a strong inference of scienter on the part of Defendant Mollenkopf with respect to his knowledge that the 810 was defective, and the Court will, therefore, impute scienter to Defendant Qualcomm. As discussed previously, Plaintiff has sufficiently alleged that it is plausible the 810 suffered from serious overheating issues and was defective. An analysis of Plaintiff's scienter allegations likewise suggests that it is cogent to infer that Defendant Mollenkopf and Qualcomm made either false or misleading statements intentionally, or with deliberate recklessness, as they either had direct knowledge of the 810's propensity to overheat or had access to such knowledge. Because the Court finds scienter with respect to Defendant Mollenkopf and Qualcomm, the Court declines to analyze scienter under a holistic review of Plaintiff's allegations. *See Tellabs*, 551 U.S. at 322-24 (permitting the Court to read a series of less precise allegations together to meet the PSLRA requirement).

### E.     Section 10(b) Conclusion

Based on the falsity, scienter, and loss causation analyses, Plaintiff's 10(b) cause of action survives the motion to dismiss based on the two statements made by Defendants Mollenkopf and Qualcomm on January 28, 2015. *See* SAC ¶¶ 232-33. Accordingly, the Court **DENIES** Defendants' motion to dismiss the Section 10(b) cause of action as to Defendants Mollenkopf and Qualcomm. The Court finds that Plaintiff cannot cure the deficiencies of loss causation with respect to the July 22, 2015 corrective disclosure, and cannot cure the insufficiently pleaded falsity of statements made prior to January 28, 2015. As a result, the Court **GRANTS** the motion to dismiss the Section 10(b) cause of action without leave to amend as to Defendants Amon, Aberle, Renduchintala, and McDonough. *See Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986) ("[L]eave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.").

//

//

### F.    Section 20(a)

Plaintiff also alleges a claim under Section 20(a) of the Exchange Act, which requires "(1) a primary violation of federal securities law, and (2) that the defendant exercised actual power or control over the primary violator."  *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).  Defendants' motion to dismiss this claim is predicated entirely on the argument that the SAC fails to state a primary violation of Section 10(b) for failure to adequately plead falsity, scienter, or loss causation.  *See* MTD.  Thus, because the Court finds that the SAC sufficiently pleads falsity, loss causation, and a strong inference of scienter, with reference to some statements, the Court **DENIES** Defendants' motion to dismiss the Section 20(a) claim as to Defendants Mollenkopf and Qualcomm, and **GRANTS** Defendants' motion to dismiss the Section 20(a) claims as to the Defendants Amon, Aberle, Renduchintala, and McDonough without leave to amend.  *See Schreiber Distrib. Co.*, 806 F.2d at 1401.

<u>CONCLUSION</u>

For the foregoing reasons, the Court **DENIES** Defendants' motion to dismiss as to Defendants Mollenkopf and Qualcomm, and **GRANTS** Defendants' motion to dismiss as to Defendants Amon, Aberle, Renduchintala, and McDonough.  The Court **DISMISSES** Plaintiff's claims against Defendants Amon, Aberle, Renduchintala, and McDonough without leave to amend. The Clerk of Court is instructed to terminate the action as to Defendants Amon, Aberle, Renduchintala, and McDonough.

**IT IS SO ORDERED**.

Dated:  October 20, 2017

Hon. Michael M. Anello
United States District Judge